# IN THE SUPREME COURT OF TEXAS

No. 14-0171

IN RE MEMORIAL HERMANN HOSPITAL SYSTEM; MEMORIAL HERMANN PHYSICIAN NETWORK; MICHAEL MACRIS, M.D.; MICHAEL MACRIS, M.D., P.A.; AND KEITH ALEXANDER, RELATORS

ON PETITION FOR WRIT OF MANDAMUS

**Argued February 25, 2015**

JUSTICE WILLETT delivered the opinion of the Court.

A decade ago, we observed: "While the medical privileges are important in promoting free discussion in the evaluation of health care professionals and health services, the right to evidence is also important, and therefore privileges must be strictly construed."[1] In this original proceeding—involving a heart surgeon who claims his former hospital retaliated against him for joining a competing hospital—we must determine whether either the medical committee privilege or the medical peer review committee privilege protects certain documents from disclosure. The trial court concluded the documents sought were discoverable, and the court of appeals denied relief, prompting the parties resisting production to seek mandamus relief here. We hold that some of the documents are protected, and we conditionally grant mandamus relief as to them. But we are unconvinced that the remainder of the documents are confidential under either privilege.

---

[1] *In re Living Ctrs. of Tex., Inc.*, 175 S.W.3d 253, 258 (Tex. 2005).

# BACKGROUND

Plaintiffs Miguel A. Gomez, III, M.D. and Miguel A. Gomez, M.D., P.A. (collectively, "Dr. Gomez") filed suit against defendants Memorial Hermann Hospital System,[2] Memorial Hermann Physician Network, Michael P. Macris, M.D., Michael P. Macris, M.D., P.A.,[3] and Keith Alexander[4] (collectively, "defendants" or "Memorial Hermann") on September 17, 2012. Dr. Gomez's original petition asserted causes of action for business disparagement, defamation, tortious interference with prospective business relations, and improper restraint of trade under the Texas Free Enterprise and Antitrust Act of 1983 ("TFEAA").

Dr. Gomez is a cardiothoracic surgeon who practiced at Memorial Hermann Memorial City Medical Center ("Memorial City")[5] from 1998 until 2012 when he resigned his privileges with Memorial City.[6] During his years of practice at Memorial City, Dr. Gomez built a reputation in the "West Houston and Katy community" for "quality patient care, technical excellence, and outstanding professionalism in heart and general surgery."

Dr. Gomez's "skills and specialized abilities" for patients who require heart and general surgeries range from "'basic' open heart surgery to advanced robotic-assisted surgical procedures." Robotic heart surgery "eliminates the need to mechanically crack open a patient's chest." Robotic heart surgery always involves significantly less recovery time than its non-robotic

---

[2] Memorial Hermann Hospital System is a business entity organized under the laws of the State of Texas that controls and manages a number of hospitals, out-patient facilities, and other health care service centers throughout the Houston Metropolitan area, including Memorial Hermann Memorial City Medical Center.

[3] Michael P. Macris, M.D., P.A. is a professional association organized under the laws of Texas, and Michael P. Macris, M.D. is its principal officer.

[4] Mr. Alexander is the Chief Executive Officer of Memorial Hermann Memorial City Medical Center.

[5] Memorial City is one of Memorial Hermann Hospital System's medical campuses.

[6] The facts described in this section are drawn from allegations in Dr. Gomez's live petition and attached exhibits. They are presented in the light most favorable to the trial court's finding.

surgical analogue, and depending on the particular procedure, can spare the patient up to six days of recovery time in the hospital. Robotic heart surgery therefore has the potential to save an individual patient $50,000 or more in medical expenses.

In the Houston medical community, Dr. Gomez "pioneer[ed] implementation of 'off-pump' surgery and robotic-assisted heart surgeries." Memorial City heavily promoted robotic heart surgery as well as Dr. Gomez himself—the only heart surgeon at Memorial City who was capable of performing robotic heart surgeries. The hospital invested in a million dollar "DA VINCI" machine, and spent significant advertising dollars promoting the robotic-assisted surgical procedures.

Referrals from other physicians are extremely important to surgeons and specialists. The primary means for a physician "to build his practice is . . . actually going out on his own to doctor's offices, meeting the doctors, [and] developing relationships" in order to get referrals from physicians. The success of a surgeon's practice depends on his ability to attract referrals, and cardiologists are a cardiovascular surgeon's primary referral source. In turn, the surgeon's decision to perform his surgeries at one hospital over another directly impacts the profitability of the hospitals.

In 2009, another hospital—Methodist West Houston Hospital—was in the process of opening, which caused a change in the atmosphere at Memorial City. There was a growing fear at Memorial City that staff would leave to go to Methodist West. Around this time, the then-CEO of Memorial City and the Chief of Staff[7] met with at least one of Memorial City's physicians, Dr. Jo Pollack, in order to express disapproval of Dr. Pollack's pattern of referring her patients to non-

---

[7] At the time of the meeting, Dave Jones was the CEO of Memorial City and Dr. Joel Abramowitz was the Chief of Staff. Shortly after the meeting took place, Mr. Alexander became CEO.

affiliated facilities and physicians. According to Dr. Pollack's affidavit, she was told she would be "committing political suicide" and her practice "could be in jeopardy" if she did not refer her patients to the Memorial City affiliated medical oncologists, radiation oncologists and imaging. Memorial City also began holding "Town Hall" meetings in order to "gain information about who wanted to leave and to attempt to persuade people to stay at Memorial City."

Of the heart surgeons who practiced at Memorial City, Dr. Gomez was the first to agree to practice at Methodist West. Dr. Gomez asserts that, because of his complaints about staffing and equipment dysfunctions as well as Memorial City's priorities regarding patient care, Memorial City knew he would perform his surgeries at Methodist West in the future. Consequently, despite having invested heavily in promoting robotic-assisted heart surgery, Memorial City would no longer be the sole Houston hospital offering robotic-assisted heart surgeries. Memorial City faced sharing, or worse, losing that distinction to Methodist West.

When the defendants learned that Dr. Gomez was willing to associate himself with Methodist West, the defendants began conducting a "whisper campaign" against Dr. Gomez. According to Dr. Gomez, the purpose of the campaign was "to cast doubt on robotic heart surgery procedures," throughout the entire city of Houston and "evaporate" the "robotic heart surgery market." If the campaign was successful, it would inoculate Memorial City from the advantage Methodist West would otherwise gain from the ability to offer the superior procedure.

Rumors began spreading across the Memorial City campus that Dr. Gomez was "having problems" with his mortality rate, and the marketing director at Memorial City did an "about-face" regarding Dr. Gomez. Portia Willis, who was then employed in Memorial City's marketing department, had scheduled speaking engagements and other promotional engagements for Dr. Gomez on behalf of Memorial City. But amidst the rumors, Ms. Willis was told not to push forward

4

with any type of marketing or promotion of Dr. Gomez indefinitely. Although the reasons for the marketing hiatus were not explained, Ms. Willis had the impression that the move was related to the rumors that Dr. Gomez was "a crappy surgeon." By this point, rumors had become "rampant" that Dr. Gomez "wasn't the surgeon that [the Hospital workers] thought he was," and the hospital's employees began to wonder how much longer Dr. Gomez's practice could endure.

At a "Cardiovascular and Thoracic CPC" meeting on November 1, 2011, Dr. Macris displayed "false data and statements regarding Dr. Gomez's practice and mortality rates of his patients to an entire room filled with Dr. Gomez's professional colleagues, intending that it be thereafter widely disseminated." The presentation "create[d] the appearance that patients were more likely to die in Dr. Gomez's care." Dr. Macris had "manipulated" the presented data, eschewing generally accepted methodologies for proper peer review comparison as well as basic scientific principles. Although the "true" peer review committee at Memorial Hermann[8] intervened and ultimately determined Dr. Macris's comparative data could not be relied upon for any legitimate purpose, the defendants continued to disseminate the manipulated data within the medical community. This spread the false impression of Dr. Gomez's practice. After Dr. Gomez's abilities were assessed in the cardiology section meeting, his "referral patterns were ruined," and he lost his status as one of the most sought-after surgeons.

At a January 2012 meeting, Mr. Alexander publicly ridiculed Dr. Gomez's skills as a heart surgeon. Mr. Alexander let the physicians, nurses, and administrators in the room "know that he had targeted Dr. Gomez because of his affiliation with Methodist West." Mr. Alexander "made clear . . . he would not tolerate physicians taking business to Methodist West." Destroying Dr.

---

[8] Dr. Gomez disputes whether the committee to which Dr. Macris presented the data falls within the definition of a medical peer review committee.

Gomez's reputation "served as a preemptive warning" to other physicians considering an affiliation with Methodist West.

Dr. Gomez brought suit on the claims described above and moved to compel the production of certain documents. Memorial Hermann asserted the documents were protected from discovery under the medical committee privilege and the medical peer review committee privilege. Following an in camera inspection, the trial court ordered Memorial Hermann to produce certain documents. After the court of appeals denied Memorial Hermann's petition for writ of mandamus,[9] Memorial Hermann sought mandamus relief in this Court.

## DISCUSSION

### I. Standard of review

"Mandamus is proper when the trial court erroneously orders the disclosure of privileged information because the trial court's error cannot be corrected on appeal."[10] Pleading and producing evidence establishing the existence of a privilege is the burden of the party seeking to avoid discovery.[11] The party asserting the privilege must establish by testimony or affidavit a prima facie case for the privilege.[12] The party need produce "only the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true,'" and tender the documents to the trial court, at which point, "the trial court must conduct an in camera inspection

---

[9] *In re Mem'l Hermann Hosp. Sys.*, 2014 WL 866069 (Tex. App.—Houston [1st Dist.] March 4, 2014, orig. proceeding).

[10] *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 222 (Tex. 2004).

[11] *State v. Lowry*, 802 S.W.2d 669, 671 (Tex. 1991); *Jordan v. Court of Appeals for Fourth Supreme Judicial Dist.*, 701 S.W.2d 644, 648–49 (Tex. 1985).

[12] *In re Living Ctrs. of Tex., Inc.*, 175 S.W.3d at 261; *Lowry*, 802 S.W.2d at 671.

6

of [the] documents before deciding to compel production."[13]

A reviewing court may not substitute its judgment for that of the trial court regarding "the resolution of fact issues or matters committed to the trial court's discretion."[14] "The scope of discovery and the admission of evidence is principally within the discretion of the trial court."[15] The relator must establish that the trial court failed to reach the only reasonable conclusion on such matters.[16] A less deferential standard applies to the trial court's determination of the legal principles governing the discovery, however.[17]

## II.  The trial court did not abuse its discretion in holding that the "anticompetitive action" exception to the medical peer review committee privilege applied.

### A.  Under certain circumstances, the medical peer review committee privilege limits the accessibility of the records of, proceedings of, and communications to a medical peer review committee.

A medical peer review committee includes "a committee of a health care entity [including a hospital licensed under Chapter 241 or 577 of the Health and Safety Code] . . . or the medical staff of a health care entity" that (1) "operates under written bylaws" approved by either the policy-

---

[13] *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d at 222 (quoting *Tex. Tech. Univ. Health Scis. Ctr. v. Apodaca*, 876 S.W.2d 402, 407 (Tex. App.—El Paso 1994, writ denied)).

[14] *Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex. 1992).

[15] *Flores v. Fourth Court of Appeals*, 777 S.W.2d 38, 41 (Tex. 1989).

[16] *Id.*

[17] *Walker*, 827 S.W.2d at 840 ("In determining whether the trial court abused its discretion in the present case, we treat the trial court's erroneous denial of the requested discovery on the sole basis of *Russell* as a legal conclusion to be reviewed with limited deference to the trial court."); *see also Marathon Oil Co. v. Moye*, 893 S.W.2d 585, 589 (Tex. App.—Dallas 1994, orig. proceeding) ("When a trial court's interpretation of discovery law is at issue, we treat the trial court's order as a legal conclusion. We review the legal conclusion with limited deference to the trial court.").

making or governing board of the health care entity, and (2) "is authorized to evaluate the quality of medical and health care services or the competence of physicians."[18]

"All proceedings and records of a medical peer review committee are confidential, and all records of, determinations of, and communications to a committee are privileged and are not discoverable, with certain exceptions. . . ."[19] The provision of confidentiality extends to the committee's initial and subsequent credentialing decisions,[20] as well as to documents "generated" by a committee or "prepared by or at the direction of the committee for committee purposes."[21] The minutes and recommendations of the committee as well as the committee's inquiries about a physician to outside sources and responses thereto are also protected.[22] However, "simply passing a document through a peer review committee does not make it privileged."[23] The privilege does not prevent a party from discovering from a nonprivileged source material that has been presented to the committee.[24]

Texas Occupations Code section 160.007's provisions "expressly delineate and limit the circumstances under which the records of and communications to a peer review committee may [or must] be accessed."[25] The committee may disclose its records and proceedings, and

---

[18] TEX. OCC. CODE § 151.002(a)(8); *see also id.* § 151.002(a)(5) (defining "Health care entity").

[19] *In re Univ. of Tex. Health Ctr. at Tyler*, 33 S.W.3d 822, 825 (Tex. 2000); *see also* TEX. OCC. CODE § 160.007(a) ("Except as otherwise provided by this subtitle, each proceeding or record of a medical peer review committee is confidential, and any communication made to a medical peer review committee is privileged.").

[20] *Mem'l Hosp.—The Woodlands v. McCrown*, 927 S.W.2d 1, 3–5 (Tex. 1996).

[21] *Id.* at 10; *see also In re Living Ctrs. of Tex., Inc.*, 175 S.W.3d at 257.

[22] *In re Living Ctrs. of Tex., Inc.*, 175 S.W.3d at 257.

[23]*Id.*

[24] *Id.* at 260; *McCrown*, 927 S.W.2d at 10.

[25] *Irving Healthcare Sys. v. Brooks*, 927 S.W.2d 12, 16 (Tex. 1996).

communications made by the committee to other medical peer review committees, appropriate governmental agencies, national accreditation bodies, the Texas Medical Board, and another state's board of registration or licensing of physicians.[26] The committee may disclose to a physician under its review confidential information relevant to the matter without waiving confidentiality.[27] The committee must provide the physician with a written copy of its recommendation and final decision for certain actions, including those that could result in "censure, suspension, restriction, limitation, revocation, or denial of membership or privileges in a health care entity."[28] Certain parties are entitled to use the confidential information in their defense or in rebuttal to such a defense.[29] Otherwise, the records and determinations of a medical peer review committee, as well as communications to the committee, are "not subject to subpoena or discovery and [are] not admissible as evidence in any civil judicial or administrative proceeding without waiver of the privilege of confidentiality executed in writing by the committee."[30]

However, under certain circumstances, the information may not be confidential, in which case it would not be subject to a privilege. For example, the "records made or maintained in the regular course of business by a hospital . . . [or] medical organization" are not covered by section 160.007 and therefore are not confidential under that section.[31] In addition,

---

[26] TEX. OCC. CODE § 160.007(c); *see also id.* § 151.002(a)(1)("'Board' means the Texas Medical Board.").

[27] *Id.* § 160.007(d).

[28] *Id.*

[29] *See id.* § 160.007(f).

[30] *Id.* § 160.007(e).

[31] TEX. HEALTH & SAFETY CODE § 161.032(f). However, the fact that a committee reviewed such records is protected. *See In re Living Ctrs. of Tex.*, 175 S.W.3d at 257 ("The peer review privilege protects the products of the peer review process: reports, records (including those produced for the committee's review as part of the investigative review process), and deliberations."); *Brooks*, 927 S.W.2d at 18.

section 160.007(b) provides a limited exception to confidentiality for proceedings, records, or communications that are relevant to an anticompetitive action. The anticompetitive action exception provides in full:

> If a judge makes a preliminary finding that a proceeding or record of a medical peer review committee or a communication made to the committee is relevant to an anticompetitive action, or to a civil rights proceeding brought under 42 U.S.C. Section 1983, the proceeding, record, or communication is not confidential to the extent it is considered relevant.[32]

The parties dispute the applicability of this exception.

### B. The committees at issue are medical peer review committees.

As an initial matter, Dr. Gomez disputes that Memorial Hermann proved the relevant committees are medical peer review committees. The trial court found "that the anticompetitive exception to the medical peer review committee privilege applies," which inherently implies a finding that the relevant committees were medical peer review committees. Dr. Gomez argues that Memorial Hermann failed to establish that the investigations were performed for the purpose of quality assessment, or that the committee was established by bylaws.

With one exception,[33] the medical peer review committee privilege affords confidential status to the records of, proceedings of, and communications to a medical peer review committee regardless of whether the individual record, proceeding, or communication relates to a peer review action.[34] Memorial Hermann submitted the committees' bylaws as well as affidavits stating that the committees engaged in peer review. Although Dr. Gomez points us to evidence to the contrary,

---

[32] TEX. OCC. CODE § 160.007(b).

[33] *See id.* § 151.002(a)(8)(B).

[34] *Compare id.* § 151.002(a)(7) (defining medical peer review) *with id.* § 151.002(a)(8) (defining medical peer review committee).

10

the trial court had sufficient evidence before it to make a reasonable finding that the committees are medical peer review committees. We will not disturb that finding.

### C. An "anticompetitive action" is one that requires proof of a net negative impact on competition within a defined market.

The trial court found that the documents at issue "are relevant to an anticompetitive action." Before we can resolve the parties' dispute regarding the correctness of this finding, we must first determine the meaning of the statutory phrase "relevant to an anticompetitive action."[35]

Statutory construction is a question of law we review de novo.[36] Our objective is to determine and give effect to the Legislature's intent,[37] and "the truest manifestation of what lawmakers intended is what they enacted."[38] Proper construction requires reading the statute as a whole rather than interpreting provisions in isolation.[39] "[C]ourts should not give an undefined statutory term a meaning out of harmony or inconsistent with other provisions, although it might be susceptible of such a construction if standing alone."[40] "We presume that the Legislature chooses a statute's language with care," and we will not ignore the statute's use of a term that carries a "particular meaning."[41] "Privileges are not favored in the law and are strictly construed."[42]

---

[35] TEX. OCC. CODE § 160.007(b).

[36] *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002).

[37] *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 484 (Tex. 1998).

[38] *Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 635 (Tex. 2013).

[39] *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004).

[40] *Needham*, 82 S.W.3d at 318.

[41] *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011).

[42] *Jordan*, 701 S.W.2d at 647.

Neither section 160.007 nor any other peer review committee privilege that incorporates the phrase "anticompetitive action" defines the term.[43] Black's Law Dictionary defines "anticompetitive" as "[h]aving a tendency to reduce or eliminate competition" in contrast to the term procompetitive.[44] Procompetitive is in turn defined as "[i]ncreasing, encouraging, or preserving competition."[45] Competition itself is defined as "[t]he struggle for commercial advantage; the effort or action of two or more commercial interests to obtain the same business from third parties."[46] The dictionary also notes that the term anticompetitive "describes the type of conduct or circumstances generally targeted by antitrust laws,"[47] although the statement is "not purely definitional."[48]

This framework accurately maps out the meaning afforded the term "anticompetitive" in court decisions in the antitrust context. As noted by the Supreme Court of the United States, to restrain competition is the "very essence" of every agreement and regulation of trade.[49] Therefore, regarding restraints of trade, "[t]he true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition."[50] As such, an "abbreviated or 'quick-look' analysis" is appropriate

---

[43] *See, e.g.*, TEX. OCC. CODE §§ 261.051 (dental peer review committee); 202.454(b) (podiatric peer review committee); 564.103(b) (pharmacy peer review committee).

[44] BLACK'S LAW DICTIONARY 113 (10th ed. 2014).

[45] *Id.* at 1400.

[46] *Id.* at 344.

[47] *Id.* at 113.

[48] *See id.* at xxxii (noting that "[b]ullets are used to separate definitional information (before the bullet) from information that is not purely definitional (after the bullet), such as encyclopedic information or usage notes").

[49] *Bd. of Trade of City of Chi. v. United States*, 246 U.S. 231, 238 (1918).

[50] *Id.*; *see also State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) ("Although the Sherman Act, by its terms, prohibits every agreement 'in restraint of trade,' this Court has long recognized that Congress intended to outlaw only

only when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets."[51] The goal of judicial scrutiny of restraints on trade is to "distinguish[] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest."[52]

Judicial scrutiny in other areas of antitrust law confirms that the antitrust laws were designed as a "consumer welfare prescription" that requires consideration of both anticompetitive and procompetitive effects.[53] Thus, proof that a firm's dominant position is the "consequence of a superior product, business acumen, or historic accident"—circumstances that either benefit the consumer or are outside the firm's control—will defeat a claim of monopoly.[54] Claims of attempted monopolization require the further showing that the defendant "pose[s] a danger of monopolization," because judging unilateral conduct absent actual potential to achieve a monopoly would "risk that the antitrust laws will dampen the competitive zeal of a single aggressive

---

unreasonable restraints."); *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986) ("Absent some countervailing procompetitive virtue—such as, for example, the creation of efficiencies in the operation of a market or the provision of goods and services . . .—such an agreement limiting consumer choice by impeding the 'ordinary give and take of the market place' cannot be sustained under the Rule of Reason."); *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290, 342 (1897) ("The necessary effect of the agreement is to restrain trade or commerce, no matter what the intent was on the part of those who signed it.").

[51] *Cal. Dental Ass'n v. F.T.C.*, 426 U.S. 756, 770 (1999).

[52] *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007).

[53] *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Ok.*, 468 U.S. 85, 107 (1984) (internal quotation marks omitted). *See also* TEX. BUS. & COMM. CODE § 15.04 ("The purpose of this Act is to maintain and promote economic competition in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state.").

[54] *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).

entrepreneur."[55] Similarly, in scrutinizing a proposed merger, the "economic efficiencies produced by the merger must be weighed against anticompetitive consequences in the final determination whether the *net effect* on competition is substantially adverse."[56] Ultimately, the "use of the word 'competition' [is] a shorthand for the invocation of the benefits of a competitive market,"[57] and antitrust law acknowledges that "it is sometimes difficult to distinguish robust competition from conduct with long-run anticompetitive effects."[58]

We have no trouble holding that the Legislature intended the term "anticompetitive" in section 160.007 to denote an overall substantially adverse effect on competition, rather than the existence of some negative effects. However, we reject Memorial Hermann's characterization of the term "anticompetitive action" as synonymous with "antitrust action." Although we agree that the term anticompetitive "describes the type of conduct or circumstances *generally* targeted by antitrust laws,"[59] the term itself is broader because the law of antitrust does not encompass *all* conduct that could substantially lessen competition in a particular market. For example, certain conduct—regardless of its overall impact on competition—is immune from antitrust law under the

---

[55] *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767–68 (1984); *Swift & Co. v. United States*, 196 U.S. 375, 402 (1905) ("Not every act that may be done with intent to produce an unlawful result is unlawful, or constitutes an attempt. It is a question of proximity and degree.").

[56] *F.T.C. v. Procter & Gamble Co.*, 386 U.S. 568, 597 (1967) (emphasis added).

[57] *Id.*

[58] *Copperweld Corp.*, 467 U.S. at 767–68.

[59] BLACK'S LAW DICTIONARY 113 (10th ed. 2014) (emphasis added).

state action doctrine,[60] the exemption for political activity,[61] or the exemptions, both implicit and explicit, for labor unions.[62] The terms anticompetitive and antitrust are therefore not inherently coextensive, and we cannot ignore the Legislature's use of the broader term, particularly in juxtaposition to section 160.007(b)'s specificity regarding its application to civil rights proceedings.[63]

However, this does not mean that a litigant may successfully rely on subsection (b) simply by adding a gratuitous allegation that the conduct at issue is anticompetitive. Section 160.007(b) requires a "preliminary finding that a proceeding or record of a medical peer review committee or a communication made to the committee *is relevant to an anticompetitive action*" and provides that "the proceeding, record, or communication is not confidential *to the extent it is considered*

---

[60] *See, e.g.*, *Cmty. Commc'ns Co. v. City of Boulder, Colo.*, 455 U.S. 40, 48 (1982) (holding that federal antitrust law does not "prohibit[] a State, in the exercise of its sovereign powers, from imposing certain anticompetitive restraints"); *E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961) ("[W]here a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, no violation of the [Sherman] Act can be made out."); *Parker v. Brown*, 317 U.S. 341, 351 (1943) ("The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state."). *See also* TEX. BUS. & COMM. CODE § 15.05(g) ("Nothing in this section shall be construed to prohibit activities that are exempt from the operation of the federal antitrust laws . . . except that an exemption otherwise available under the McCarran-Ferguson Act . . . does not serve to exempt activities under this Act.").

[61] *Noerr Motor Freight, Inc.*, 365 U.S. at 136 ("[T]he Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly."); *see also Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 611 (1972) (extending *Noerr* to "the approach of citizens . . . to administrative agencies . . . and to courts").

[62] *Brown v. Pro Football, Inc.*, 518 U.S. 231, 237 (1996) ("[T]he implicit exemption recognizes that, to give effect to federal labor laws and policies and to allow meaningful collective bargaining to take place, some restraints on competition imposed through the bargaining process must be shielded from antitrust sanctions."); *Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 621–22 (1975) (holding that certain federal statutes "declare that labor unions are not combinations or conspiracies in restraint of trade, and exempt specific union activities, including secondary picketing and boycotts, from the operation of the antitrust laws").

[63] *See* TEX. OCC. CODE § 160.007(b) (limiting the exception's application to "civil rights proceeding[s] brought under 42 U.S.C. Section 1983").

15

*relevant*."[64] Relevance cannot be determined in isolation of the elements of an asserted cause of action.

Dr. Gomez's contrary construction treats the terms action and conduct as synonymous,[65] but as we have previously noted, this Court has "equated 'action' with 'suit.'"[66] Although we have not previously discussed the meaning of the word action in this particular context, we have held that generally the term is "synonymous with 'suit,' which is a demand of one's rights in court."[67] Had the Legislature intended the focus to be on the defendant's conduct apart from any asserted cause of action, it would have been more natural to say "an anticompetitive act" or "anticompetitive conduct." But the Legislature chose the term "action," which is a well-established legal term of art synonymous with lawsuit.[68] This meaning also better fits the parallelism of the phrases "anticompetitive action"[69] and "a civil rights proceeding"[70] in subsection (b).

At any rate, the exception's reference to relevance confirms that the Legislature intended the term action to refer to a "civil or criminal judicial proceeding."[71] Our rules of evidence provide

---

[64] *Id.* (emphases added).

[65] *See* BLACK'S LAW DICTIONARY 35 (10th ed. 2014) (listing "[t]he process of doing something; conduct or behavior" as one definition of action).

[66] *Thomas v. Oldham*, 895 S.W.2d 352, 356 (Tex. 1995).

[67] *Id.*

[68] *See id. See also* BLACK'S LAW DICTIONARY 35 (10th ed. 2014) ("'The terms 'action' and suit' are nearly if not quite synonymous. But lawyers usually speak of proceedings in courts of law as 'actions,' and those in courts of equity as 'suits.'" (quoting Edwin E. Bryant, *The Law of Pleading Under the Codes of Civil Procedure* 3 (2d ed. 1899))).

[69] TEX. OCC. CODE § 160.007(b).

[70] *Id.*

[71] BLACK'S LAW DICTIONARY 28 (7th ed. 1999), *quoted in Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 564 (Tex. 2014) (plurality op.).

that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and if that "fact is *of consequence* in determining the action."[72] A purely voluntary showing that the defendant's conduct is anticompetitive cannot constitute a fact of consequence in a lawsuit—the limited waiver of confidentiality for proceedings, records, and communications "relevant to an anticompetitive action"[73] can only apply if the plaintiff asserts a cause of action that requires proof of anticompetitive conduct or effects.[74]

In light of the rarity of claims that require proof of a net anticompetitive effect, as a practical matter, our interpretation will not greatly expand the scope of an "anticompetitive action" beyond valid antitrust claims. However, our caselaw has already identified at least one cause of action that potentially falls within the interstice between anticompetitive and antitrust—tortious interference with prospective business relations.[75] As we have previously held, recovery for tortious

---

[72] TEX. R. EVID. 401 (emphasis added).

[73] TEX. OCC. CODE § 160.007(b).

[74] As already illustrated in our brief review of the meaning of "anticompetitive," there is no practical difference between the terms anticompetitive conduct and anticompetitive effects as used in the caselaw, because we do not deem conduct anticompetitive unless it has a net anticompetitive effect.

[75] Memorial Hermann argues that our decision in *Irving Healthcare Sys. v. Brooks*, 927 S.W.2d 12 (Tex. 1996), forecloses argument that section 160.007(b)'s anticompetitive action exception encompasses routine business torts, including interference with prospective business relations. In *Brooks*, we noted that "the statute provides that if a court makes a preliminary finding that a medical peer review committee's proceedings, records, or communications are relevant to an anticompetitive action . . . they are not confidential," but that "a similar provision for a libel action in which the plaintiff claims malice" was "[n]oticeably absent from the statute." 927 S.W.2d at 16. We also held that the statute did not "explicitly exclude from its confidentiality provisions any of [the plaintiff's] other causes of action." *Id.*

The plaintiff in *Brooks* sued for libel, slander, "intentional infliction of mental anguish," and interference with business relations. *Id.* at 14–15. The plaintiff alleged that the defendant had "intentionally and maliciously supplied false information, thereby damaging or destroying [the plaintiff's] ability to gain admittance to the medical staffs of the hospitals to which he applied." *Id.* Thus, *Brooks* did not require us to review the applicability of subsection (b), because the trial court never made the required preliminary finding of relevance to an anticompetitive action. Furthermore, although the plaintiff's "other causes of action," included an allegation that the defendant tortiously interfered with prospective business relations, the plaintiff did not allege that the conduct was independently wrongful because the provision of false information had a negative effect on competition and constituted an antitrust violation. Our decision today is therefore consistent with our holding in *Brooks*.

17

interference with a prospective business relation requires a plaintiff to "prove that the defendant's conduct was independently tortious or wrongful" as an element of the cause of action.[76] Thus, even without asserting a cause of action under the TFEAA,[77] a plaintiff who asserts that a defendant's conduct is independently wrongful because it violates the laws of antitrust[78] would, as part of proving the violation, be required to show a negative effect on competition.

Such a plaintiff would still need to plead a valid antitrust *violation*, however, he would not need to plead a valid antitrust *claim*.[79] The TFEAA grants a private right of action to bring suit, but only to persons "whose business or property has been injured by reason of any conduct declared unlawful" in the Act.[80] This requires a plaintiff to prove "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."[81] Furthermore, permissible recovery is limited to "actual damages sustained" as a result of the unlawful conduct.[82] The damages must "reflect the anticompetitive

---

[76] *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2006).

[77] TEX. BUS. & COMM. CODE § 15.01 et seq.

[78] *See Sturges*, 52 S.W.3d at 726 ("[A] plaintiff could recover for tortious interference by showing an illegal boycott, although a plaintiff could not recover against a defendant whose persuasion of others not to deal with the plaintiff was lawful.").

[79] *See generally* Phillip Areeda, *Antitrust Violations Without Damages Recoveries*, 89 HARV. L. REV. 1127 (1976) (discussing "three superficially paradoxical possibilities," each of which hypothesizes circumstances under which a plaintiff might be able to prove an antitrust violation, but not be able to recover damages under the antitrust laws).

[80] TEX. BUS. & COMM. CODE § 15.21(a)(1).

[81] *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385, 1389–90 (11th Cir. 1990) ("'The antitrust injury concept . . . requires the private antitrust plaintiff to show that his own injury coincides with the public detriment tending to result from the alleged violation. This requirement increases the likelihood that public and private enforcement of the antitrust laws will further the same goal of increased competition.'" (quoting P. Areeda and H. Hovenkamp, *Antitrust Law*, 335.1, at 261 (Supp. 1987)).

[82] TEX. BUS. & COMM. CODE § 15.21(a)(1).

effect either of the violation or of anticompetitive acts made possible by the violation"[83]—in other words, "the type of loss that the claimed violations of the antitrust laws would be likely to cause."[84]

In contrast, tortious interference with business relations "provides a remedy for injurious conduct that other tort actions might not reach . . . but only for conduct that is already recognized to be wrongful under the common law or by statute."[85] Thus, in *Wal-Mart Stores, Inc. v. Sturges*, we provided the example of "a defendant who threatened a customer with bodily harm if he did business with the plaintiff."[86] We stated that such a defendant would be liable because the defendant's "conduct toward the customer—assault—was independently tortious," even though the plaintiff would not be able to sue the defendant for the assault itself.[87]

In sum, we hold that the exception to the medical peer review committee privilege for anticompetitive actions applies when the plaintiff asserts a cause of action that requires proof that the conduct at issue has "a tendency to reduce or eliminate competition"[88] that is not offset by countervailing procompetitive justifications.[89]

---

[83] *Brunswick Corp.*, 429 U.S. at 489.

[84] *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 125 (1969).

[85] *Sturges*, 52 S.W.3d at 713.

[86] *Id.*

[87] *Id. Compare Brunswick Corp.*, 429 U.S. at 488 (rejecting the lower court holding that "once a merger is found to violate [section 7 of the Clayton Act], all dislocations caused by the merger are actionable, regardless of whether those dislocations have anything to do with the reason the merger was condemned").

[88] BLACK'S LAW DICTIONARY 113 (10th ed. 2014).

[89] *Cf. Ind. Fed'n of Dentists*, 476 U.S. at 459.

### D. Subsection (b) requires a plaintiff to plead, not present evidence of, an anticompetitive action.

We also reject Memorial Hermann's contention that section 160.007(b) conditions its exception to confidentiality on the plaintiff's satisfaction of an evidentiary burden. The Legislature knows how to provide this type of gatekeeping function,[90] and subsection (b) is devoid of any language indicating intent to do so. The statute does not reference expert reports,[91] affidavits,[92] or categories of evidence to be considered.[93] Significantly, other than requiring a "preliminary finding" that the material be "relevant to an anticompetitive action,"[94] subsection (b) contains no indication of a threshold quantum of proof.[95] Determinations of potential relevancy or privilege typically do not require a litigant to produce evidence on the merits of his claim—as opposed to

---

[90] *Cf. Bioderm Skin Care, LLC v. Stock*, 426 S.W.3d 753, 756 (Tex. 2014) (holding the Texas Medical Liability Act "requires claimants asserting health care liability claims to substantiate their claims with an expert report"); *Crosstex Energy Srvs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 387 (Tex. 2014) (holding that the certificate of merit statute requires plaintiffs to "file an affidavit . . . [that] substantiate[s] the plaintiff's claim on each theory of recovery").

[91] *Compare* TEX. CIV. PRAC. & REM. CODE §§ 74.351(a) ("In a health care liability claim, a claimant shall . . . serve on that [defendant] or the [defendant's] attorney one or more expert reports. . . ."); 128.053(a) ("In a suit against a sport shooting range . . . a claimant shall . . . serve on each party or the party's attorney one or more expert reports. . . ."); *see also* TEX. HEALTH & SAFETY CODE § 841.101(b) ("In preparation for a judicial review conducted under Section 841.102, the case manager shall provide a report of the biennial examination to the judge.").

[92] *Compare* TEX. CIV. PRAC. & REM. CODE §§ 14.004(a) ("An inmate who files an affidavit or unsworn declaration of inability to pay costs shall file a separate affidavit or declaration. . . ."); 150.002(a) ("In any action or arbitration proceeding for damages arising out of the provision of professional services by a licensed or registered professional, the plaintiff shall be required to file with the complaint an affidavit of a third-party licensed architect, licensed professional engineer, registered landscape architect, or registered professional land surveyor. . . .").

[93] *Compare id.* § 27.006(a) ("[T]he court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based.").

[94] TEX. OCC. CODE § 160.007(b). *Compare Md. Am. Gen. Ins. Co. v. Blackmon*, 639 S.W.2d 455, 457 (Tex. 1982) ("We will assume for purposes of this opinion that the information ordered to be disclosed is relevant.").

[95] *Compare* TEX. CIV. PRAC. & REM. CODE § 27.005(c) ("The court may not dismiss a legal action under this standard if the party bringing the legal action establishes by *clear and specific* evidence a prima facie case for each essential element of the claim in question." (emphasis added)); TEX. HEALTH & SAFETY CODE § 841.102(c) ("The judge shall set a hearing if the judge determines at the biennial review that . . . *probable cause* exists to believe that the person's behavioral abnormality has changed to the extent that the person is no longer likely to engage in a predatory act of sexual violence." (emphasis added)).

the merits of the privilege.[96] Furthermore, it is counter to the notion that "[a]ffording parties full discovery promotes the fair resolution of disputes by the judiciary,"[97] to condition access to documents that could substantiate a plaintiff's claim on the plaintiff's ability to substantiate his claim without the documents' aid.

Although Memorial Hermann's concern that plaintiffs may circumvent the privilege through artful pleading is a compelling one, defendants are not left without protection. First, by permitting defendants to recover costs incurred from defending against frivolous or bad faith pleadings, section 160.008(c) discourages the addition of groundless allegations of injury to competition.[98] Second, nothing in section 160.007 prevents defendants from seeking, as they do in all civil cases, to limit discovery on the grounds that "the discovery sought is unreasonably cumulative or duplicative, or is obtain[able] from some other source that is more convenient, less burdensome, or less expensive."[99] Defendants may also assert that "the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case . . . the importance of the issues at stake in the litigation, and the importance of the proposed discovery in

---

[96] *Cf.* TEX. R. CIV. P. 193.4(a) ("The party making the objection or asserting the privilege must present any evidence necessary *to support the objection or privilege*." (emphasis added)); *see also Lunsford v. Morris*, 746 S.W.2d 471, 473 (Tex. 1988) ("Absent a privilege or specifically enumerated exemption, our rules permit discovery of any 'relevant' matter; thus, there is no evidentiary threshold a litigant must cross before seeking discovery.").

[97] *See Lowry*, 802 S.W.2d at 673 ("[A]ll of the information sought to be discovered was gathered by the State during the investigation that led to the filing of this antitrust enforcement action. The State has refused to provide materials requested by the insurers that could lead to evidence supporting their defense. It is difficult for the insurers to make a more particularized showing of need for these documents, the contents of which are unknown to them.").

[98] *See* TEX. OCC. CODE § 160.008(c) ("A defendant subject to this section may file a counterclaim in a pending action or may prove a cause of action in a subsequent action to recover defense costs, including court costs, attorney's fees, and damages incurred as a result of the civil action, if the plaintiff's original action is determined to be frivolous or brought in bad faith.").

[99] TEX. R. CIV. P. 192.4(a).

resolving the issues."[100] Defendants may also seek protective orders to protect themselves "from undue burden, unnecessary expense, harassment, annoyance, or invasion of personal, constitutional, or property rights."[101]

Finally, because the statute provides that information "is not confidential *to the extent it is considered relevant*,"[102] the exception's scope is still narrower than the otherwise applicable scope of discovery, which permits discovery of information that "appears reasonably calculated *to lead* to the discovery of admissible evidence."[103] Defendants may further limit the scope of discovery through the judicious use of special exceptions, which are "the appropriate vehicle . . . by which an adverse party may force clarification of vague pleadings,"[104] thereby narrowing the range of facts that will be of consequence in the action.[105]

As such, we hold that judges are to determine a subsection (b) "preliminary finding" on the basis of the plaintiff's pleadings. We now turn to the application of subsection (b) to Dr. Gomez's pleadings.

### E.    Dr. Gomez pleaded an anticompetitive action.

Dr. Gomez alleged that the defendants intentionally interfered with his "longstanding and continuous relationships with referring physicians in the West Houston and Katy medical community" and that the defendants' acts constituted a "concerted effort . . . to restrain competition

---

[100] TEX. R. CIV. P. 192.4(b).

[101] TEX. R. CIV. P. 192.6(b).

[102] TEX. OCC. CODE § 160.007(b) (emphasis added).

[103] TEX. R. CIV. P. 192.3(a) (emphasis added).

[104] *Fort Bend Cnty. v. Wilson*, 825 S.W.2d 251, 253 (Tex. App.—Houston [14th Dist.] 1992, no writ).

[105] *See Roark v. Allen*, 633 S.W.2d 804, 810 (Tex. 1982) ("A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim. The purpose of this rule is to give the opposing party information sufficient to enable him to prepare a defense.").

in and monopolize surgical procedures." Dr. Gomez also asserted that the defendants' acts "constitute illegal monopolization, attempted monopolization, and/or conspiracy to monopolize under applicable Texas law."

Memorial Hermann does not dispute that Dr. Gomez alleged that Memorial Hermann violated the TFEAA, but rather, argues Dr. Gomez failed to plead a valid antitrust claim. Memorial Hermann challenges the sufficiency of Dr. Gomez's allegations, taken as true, to establish (1) a legally cognizable injury to competition, and (2) an adverse effect on competition in the relevant market. The crux of Memorial Hermann's argument is its contention that caselaw overwhelmingly establishes that a claim for an injury to a single physician at a single hospital is insufficient. We disagree with Memorial Hermann's characterization of Dr. Gomez's allegations as well as its characterization of the law.

We "construe the TFEAA in harmony with federal antitrust caselaw to promote competition for consumers' benefit."[106] "Because our own caselaw is limited, we rely heavily on the jurisprudence of the federal courts."[107]

The TFEAA declares that "[e]very contract, combination, or conspiracy in restraint of trade or commerce is unlawful," and that "it is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce."[108] As discussed above,

---

[106] *Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 688–89 (Tex. 2006); *see also* TEX. BUS. & COMM. CODE § 15.04.

[107] *Coca-Cola Co.*, 218 S.W.3d at 688–89. *Accord Caller-Times Pub. Co. v. Triad Commc'ns, Inc.*, 826 S.W.2d 576, 580 (Tex. 1992) ("Because section 15.05(b) of the Texas Antitrust Act is comparable to section 2 of the Sherman Antitrust Act, we look to federal law interpreting section 2 of the Sherman Act for guidance in interpreting section 15.05(b) of the Texas Antitrust Act."); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 687 (Tex. 1990) ("Section 15.05 is comparable to, and indeed taken from, section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1988). Accordingly, we look to federal judicial interpretations of section 1 of the Sherman Act in applying section 15.05(a) of our state antitrust law.").

[108] TEX. BUS. & COMM. CODE § 15.05(a)–(b).

23

however, the TFEAA does not operate as a *qui tam* provision,[109] but rather limits the ability to bring suit under the TFEAA to persons "whose business or property has been injured by reason of any conduct declared unlawful in Subsection (a), (b), or (c) of Section 15.05 of [the] Act."[110] Thus, courts have held that standing to pursue an antitrust suit exists only if a plaintiff shows (1) injury-in-fact, an injury to the plaintiff proximately caused by the defendant's conduct; (2) antitrust injury; and (3) proper plaintiff status, which assures that other parties are not better situated to bring suit.[111]

On its own, the elimination of a single competitor does not constitute proof of an anticompetitive effect for every market and context.[112] Claims of improper restraint of trade require a plaintiff to "plead . . . a reduction of competition in the market in general and not mere injury to their own positions as competitors in the market."[113] However, it is also well established that the United States Supreme Court has "forb[idden] as a matter of law, a defense based upon a claim that only one small firm, not competition itself, had suffered injury,"[114] because "[m]onopoly

---

[109] *Cf.* BLACK'S LAW DICTIONARY 1443 (10th ed. 2014) (defining *qui tam* action as "[a]n action brought under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive"). *See, e.g.*, TEX. HUM. RES. CODE § 36.110.

[110] TEX. BUS. & COMM. CODE § 15.21(a)(1).

[111] *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*, 123 F.3d 301, 305 (5th Cir. 1997); *but see Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1548 (11th Cir. 1996) ("'When a court concludes that no violation has occurred, it has no occasion to consider standing . . . An increasing number of courts, unfortunately, deny standing when they really mean that no violation has occurred.'" (quoting P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 360f, at 202–03 (rev. ed. 1995))).

[112] *Austin v. McNamara*, 979 F.2d 728, 739 (9th Cir. 1992) (emphasis removed); *see also Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989) ("[R]emoval of one or more competing sellers from any market necessarily has an effect on competitive conditions within that market. But removal of one or a few competitors need not equate with injury to competition.").

[113] *Les Shockley Racing, Inc.*, 884 F.2d at 508.

[114] *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 134–35 (1998) (discussing *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959)); *see also Klor's, Inc.*, 359 U.S. at 213 (holding that a group boycott was "not to be

can as surely thrive by the elimination of such small businessmen, one at a time, as it can by driving them out in large groups."[115]

"In order to successfully allege injury to competition, a . . . claimant may not merely recite the bare legal conclusion that competition has been restrained unreasonably."[116] At a minimum, the claimant must "sketch the outline of the antitrust violation with allegations of supporting factual detail."[117] Whether the practice constitutes an improper restraint of trade will depend upon whether the plaintiff's allegations "suggest[] a market in which the removal of [a single competitor] from the pool of competing sellers would adversely and unreasonably affect overall competitive conditions."[118] Under the rule of reason,[119] courts consider "a variety of factors, including 'specific information about the relevant business, its condition before and after the

<hr/>

tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy").

[115] *Klor's Inc.*, 359 U.S. at 213. *Cf. U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 597 (1st Cir. 1993) ("Ultimately the issue turns upon antitrust policy, where a permanent tension prevails between the 'no sparrow shall fall' concept of antitrust . . . and the ascendant view that antitrust protects 'competition, not competitors.'").

[116] *Les Shockley Racing, Inc.*, 884 F.2d at 508.

[117] *Id.*

[118] *Id.* at 509. *Compare Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 7 (1984) (affirming dismissal of the claim where the defendant was only one hospital of several in a large metropolitan area) *with Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 754 (10th Cir. 1999) (holding that the loss of one or two competitors alleged an injury to competition where "[t]he allegation describes the anticompetitive effect of the boycott to be the loss of competition through the elimination of AMMO's sole archery trade show competitor and the resultant loss in exhibition space output") *and Oltz v. St. Peter's Comm. Hosp.*, 861 F.2d 1440, 1446–47 (9th Cir. 1988) (exclusion of a single nurse anesthetist from a single hospital constituted an unreasonable restraint of trade where that hospital "enjoyed the overwhelming majority of the market for general surgery" and "there was no evidence that patients could effectively turn outside [the hospital] for alternate sources of anesthesia services").

[119] We note that "[o]nce experience with a particular kind of restraint enables [courts] to predict with confidence that the rule of reason will condemn it, [courts will] appl[y] a conclusive presumption that the restraint is unreasonable." *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 344 (1982). Dr. Gomez has not alleged that the conduct at issue falls within a category of behavior deemed unreasonable *per se*, however.

restraint was imposed, and the restraint's history, nature, and effect.'"[120] As such, "the adequacy of a physician's contentions regarding the effect on competition is typically resolved after discovery, either on summary judgment or after trial."[121]

A successful claim of monopoly requires proof of "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."[122] "The term 'relevant market' encompasses notions of geography as well as product use, quality, and description. The geographic market extends to the 'area of effective competition' . . . where buyers can turn for alternate sources of supply."[123] Demonstrating attempted monopolization requires proof "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."[124]

Under either claim, it is "necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market."[125] However, the disposition of the question of "a dangerous probability of achieving monopoly power" is "typically one that is not resolved at

---

[120] *Ginzburg v. Mem'l Healthcare Sys., Inc.*, 993 F. Supp. 998, 1009 (S.D. Tex. 1997) (quoting *State Oil Co.*, 522 U.S. at 10).

[121] *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995).

[122] *Grinnell Corp.*, 384 U.S. at 570–71.

[123] *Oltz*, 861 F.2d at 1446.

[124] *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

[125] *Id.*

the pleading stage unless it is clear on the face of the complaint that the 'dangerous probability' standard cannot be met as a matter of law."[126]

Here, Dr. Gomez is not complaining that the defendants have prevented him from obtaining privileges at any of the hospitals in the area, but rather that the defendants have prevented him from obtaining referrals.[127] According to Dr. Gomez's petition, the number one source of referrals for a cardiovascular surgeon is a cardiologist, and his ability to compete—regardless of whether he has staff privileges with one hospital or another—is contingent upon his reputation with those cardiologists.[128] The alleged injury to Dr. Gomez's reputation is therefore not confined to a single hospital,[129] particularly if Dr. Gomez is able to show that Memorial Hermann has the capacity to impact a substantial number of the market's cardiologists' willingness to refer patients to him.[130]

Dr. Gomez also alleges that by disseminating false information about his mortality rate, Memorial Hermann cast doubt on robotic heart surgery procedures throughout Houston,

---

[126] *Brader*, 64 F.3d at 876; *see also Oltz*, 861 F.2d at 1446 ("Defining the relevant market is a factual inquiry ordinarily reserved for the jury.").

[127] *See Brader*, 64 F.3d at 877 ("[T]he type of injury alleged by Brader (the loss of income due to an inability to practice in the relevant market area) is directly related to the illegal activity in which the defendant allegedly engaged: a conspiracy to exclude Brader from the relevant market.").

[128] *See, e.g.*, *Fuentes v. S. Hills Cardiology*, 946 F.2d 196, 202 (3d Cir. 1991) ("Fuentes alleges that the defendants acted in concert to deny Fuentes, a provider of cardiological services, access to the Pittsburgh cardiological market. Consequently, Fuentes asserts, that by eliminating him as a competitor, the boycott successfully reduced competition for the defendants' cardiological services."). *Compare BCB Anesthesia Care, Ltd. v. Passavant Mem'l Area Hosp. Ass'n*, 36 F.3d 664, 668 (7th Cir. 1994) ("The plaintiffs can practice at Passavant or elsewhere—they are not disabled from practicing wherever they choose.").

[129] *Cf. Bolt v. Halifax Hosp. Med. Ctr.*, 891 F.2d 810, 820 (11th Cir. 1990) ("[A]s the defendants' own arguments suggest, a negative decision at one hospital could affect the decision at another hospital; therefore . . . a negative decision by one hospital could be tantamount to excluding a doctor from the profession as a whole." (internal quotation marks omitted)), *overruled in part on other grounds by City of Columbia v. Omni Outdoor Adver.*, 499 U.S. 365 (1991).

[130] *Compare Coca-Cola Co.*, 218 S.W.3d at 688 (reversing a jury verdict where "there is only evidence of harm in relatively isolated instances and no evidence of substantial foreclosure or anti-competitive effect in any relevant market").

inoculating itself from competition from a medical service that Memorial Hermann could no longer offer. The deposition excerpts attached to and quoted in Dr. Gomez's petition suggest that "referral patterns changed" and that Dr. Gomez used to be the "Number One" physician, but that following the conduct at issue, another physician, a Dr. Gibson, received more referrals.[131] Dr. Gomez also suggests in his briefing that Dr. Macris may have improperly benefitted from an increase in patients due to Dr. Gomez's decrease in patients.

Dr. Gomez alleges that as a result of the loss of trust in robotic heart surgery, patients would incur $50,000 or more in medical expenses due to longer hospital stays.[132] Dr. Gomez also disputes the existence of any procompetitive justifications for presenting manipulated mortality data.[133] As Dr. Gomez has not yet had an opportunity to obtain full discovery, we are not in a position to predict whether he will ultimately be able to sustain his burden of proof on these issues, however, his petition sufficiently alleges an injury to competition under the TFEAA.[134]

---

[131] *Compare id.* ("There must be evidence of demonstrable economic effect, not just an inference of *possible* effect." (internal quotation marks omitted)).

[132] *Cf. Leegin Creative Leather Prods., Inc.*, 551 U.S. at 886 (holding that the goal of judicial scrutiny is to "distinguish[] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest").

[133] We note that there may be procompetitive justifications for allowing the presentation of even misleading data, such as allowing for freer and more informed discussions—particularly in light of procedures available to physicians to challenge the peer review process. For example, ensuring that the data cannot be challenged might delay the hospital's ability to respond to concerns raised by the data. It may be that such increased responsiveness is of greater value than the interim damage to a physician's reputation.

As we have already discussed, the inclusion and wording of the anticompetitive exception to the medical peer review committee privilege does not condition the exception on a pre-determination that the behavior at issue is indeed anticompetitive. It requires only that the action seeks to establish that the behavior is anticompetitive. This case presents itself to us at the discovery phase rather than summary judgment. The procompetitive value of allowing for the presentation of false data is a factual determination—one likely requiring the aid of expert reports—and it is not a determination that we can make as a matter of law.

[134] *See Brader*, 64 F.3d at 876.

As for Memorial Hermann's arguments regarding Dr. Gomez's identification of a relevant market in which the alleged injury to competition occurred, we hold that Dr. Gomez's petition sufficiently pleads viable markets. It may be unlikely that the relevant market for a valid injury to competition can be limited to the market for robotic-assisted heart surgery. For example, if Memorial Hermann does not have a heart surgeon capable of performing those surgeries, then Memorial Hermann could not have hoped to capture the patients who would otherwise have gone to Dr. Gomez.[135] On the other hand, if those patients are willing to substitute traditional heart surgery procedures, then a cross-elasticity of demand between the two types of procedures must exist, in which case review of the competitive impact cannot be limited to robotic-assisted heart procedures.[136]

However, although the trial court noted that Dr. Gomez alleged that Memorial Hermann's actions "impacted the referral market for heart surgeons specializing in robotic-assisted heart surgeries in Houston," the trial court did not base its conclusion that the anticompetitive exception applied on a finding of a particular market. Dr. Gomez's petition alleges multiple service markets, including the market for surgical procedures, the heart surgery market, and the referral market. Precisely because Dr. Gomez alleged so many different potential markets for his claims—as Memorial Hermann itself complains[137]—the flaw at this stage can only be with the state of

---

[135] *Cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 598 (1986) ("[A]s presumably rational businesses, petitioners had every incentive *not* to engage in the conduct with which they are charged, for its likely effect would be to generate losses for petitioners with no corresponding gains."). *But see Boczar v. Manatee Hosps. & Health Sys., Inc.*, 993 F.2d 1514, 1518 (11th Cir. 1993) ("The jury could believe that the hospital would benefit economically by securing its pre-existing ob/gyn staff and revenues. . . .").

[136] *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 393 (1956) ("Determination of the competitive market for commodities depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another.").

[137] We note that Memorial Hermann filed special exceptions regarding Dr. Gomez's allegations of the relevant market. Memorial Hermann has not requested relief regarding the trial court's denial of those special

evidence regarding the relevant market and not with Dr. Gomez's pleadings. The same criticism applies to Memorial Hermann's complaints about Dr. Gomez having alternatively pleaded different geographies for the relevant market for services.

Finally, Dr. Gomez's allegations suggest that Memorial Hermann targeted not only his own ability to compete for surgeries, but also Methodist West's competitive position. Dr. Gomez claims the destruction of his reputation served to deter Memorial Hermann's other physicians from practicing at Methodist West or from referring patients to physicians who are not affiliated with Memorial Hermann.[138] Dr. Gomez's allegations, taken as true, suggest that Memorial Hermann may have attempted to (1) intimidate a number of physicians from making referrals to specialists at Methodist West, thus cutting off Methodist West's patient base, and (2) intimidate other doctors—Methodist West's "supply" for its services—from practicing at Methodist West.[139] Even if Dr. Gomez himself would not have standing to bring a suit under the TFEAA based on antitrust injury to Methodist West,[140] Dr. Gomez could rely on the violation to show that the interference with his prospective business relations was independently wrongful.[141]

We hold that Dr. Gomez's petition presents multiple viable anticompetitive actions.

---

exceptions, however, and we do not consider whether pleading these markets in the alternative provides Memorial Hermann with "information sufficient to enable [it] to prepare a defense." *See Roark*, 633 S.W.2d at 810.

[138] *See Boczar*, 993 F.2d at 1517 ("When Dr. Boczar joined its staff, Manatee Hospital had suffered defections by members of its ob/gyn staff and feared still more ob/gyn departures to a competing hospital.").

[139] *Cf. Brown Shoe Co. v. United States*, 370 U.S. 294, 323–24 (1962) ("The primary vice of a vertical merger *or other arrangement* tying a consumer to a supplier is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a 'clog on competition.'" (emphasis added)); *Klors, Inc.*, 359 U.S. at 209 ("The concerted refusal to deal with Klor's has seriously handicapped its ability to compete and has already caused it a great loss of profits, goodwill, reputation and prestige.").

[140] *See Doctor's Hosp. of Jefferson, Inc.*, 123 F.3d at 305 (holding that standing to bring suit for antitrust requires "proper plaintiff status, which assures that other parties are not better situated to bring suit").

[141] *See Sturges*, 52 S.W.3d at 713.

**F.      The trial court did not abuse its discretion in making a preliminary finding that the documents in question are relevant to the anticompetitive actions pleaded by Dr. Gomez.**

The trial court ordered Memorial Hermann to produce a number of documents. We review the trial court's preliminary finding of relevance to each set of documents in the sealed record for an abuse of discretion.[142]

Memorial Hermann argues that the various categories of documents are not relevant to Dr. Gomez's alleged anticompetitive action because (1) a number of the documents predate November 2011, which Dr. Gomez identified in his deposition as the relevant time period for the case; (2) Dr. Gomez's action involves the purportedly improper publication of false material through different peer review committees, but he has not alleged that the documents themselves were publicly disseminated; (3) certain documents do not discuss individual or aggregated physician mortality rates, instead focusing on physician volume; (4) certain documents do not refer to Dr. Gomez; and (5) with regard to one particular slide, the slide is not relevant to any actionable antitrust conduct under Texas law. We conclude that the majority of the documents in the sealed record are relevant to essential elements of the anticompetitive causes of actions that Dr. Gomez has asserted.

Before discussing the relevance of otherwise protected documents, however, we note that some of the documents included in the sealed record do not qualify for protection under the medical peer review committee privilege. Any affidavits prepared for and submitted to the trial court are neither records nor proceedings of the committees at issue nor communications to that committee. They therefore receive no protection under either the medical peer review committee privilege or the medical committee privilege. The committee bylaws attached as exhibits to the affidavits also

---

[142] All page references in this section are to the sealed record.

do not qualify as a record of, proceeding of, or communication to the committee, and are therefore not protected.[143] However, the remaining documents in the sealed record are records or proceedings of the committees, or communications to the committee.

Dr. Gomez alleges that Memorial Hermann manipulated and disseminated data on his mortality rates in order to harm his ability to compete for surgical procedures as well as to intimidate other doctors from defecting to Methodist West. As such, the withheld documents are relevant if they would tend to make more or less probable Dr. Gomez's allegations that Memorial Hermann disseminated manipulated data on Dr. Gomez's mortality rates, that the dissemination caused Dr. Gomez's referral rates to decline, or that other doctors were fearful that they could also be targeted in such a fashion. These fact issues are at the core of Dr. Gomez's claims that Memorial Hermann violated the TFEAA and tortiously interfered with his prospective business relations.

A number of the documents at issue are relevant because they either contain data on mortality rates of cardiovascular surgeons, discuss obtaining or direct others to obtain mortality rates of cardiovascular surgeons, establish plans to review mortality data, or reference appropriate parameters for calculating mortality data. Even if Memorial Hermann never published some of the documents that contain data on mortality rates, the data could still be relevant to the veracity of any data that Memorial Hermann did publish, particularly if discrepancies appeared between the different reports of the data. Similarly, evidence establishing that Memorial Hermann did not follow what it knew to be the appropriate parameters for calculating mortality data could support an inference that Memorial Hermann intended to cast doubt on Dr. Gomez's ability as a surgeon.

---

[143] *See Brownwood Reg'l Hosp. v. Eleventh Court of Appeals*, 927 S.W.2d 24, 27 (Tex. 1996) (holding "the bylaws, rules, and regulations of [the hospital's] medical staff or Board of Trustees . . . are not records, reports, or proceedings of a hospital or medical peer review committee, nor do they reveal communications to such a committee").

The documents discussing physician volume are relevant. Memorial Hermann's argument that these documents lack any discussion of Dr. Gomez's mortality rates does not negate the documents' potential relevance to Dr. Gomez's allegations that he suffered a loss of referrals. The documents could also tend to prove or disprove a corresponding increase in referrals to Memorial Hermann's other physicians, which could support Dr. Gomez's allegations that Memorial Hermann violated the TFEAA. Furthermore, although the data on physician volume predates the time period in which Dr. Gomez alleges his referral rate declined, such data could still provide a baseline for measuring the effect of the alleged conduct. Documents relating to referral patterns, either of particular physicians or Memorial Hermann itself, are also relevant for the same reasons.

We note that the data on mortality and physician volume are associated with assigned numbers rather than the names of particular physicians in a number of the documents. However, although Memorial Hermann would be free to present evidence suggesting that the code effectively concealed the physicians' identities, the existing overlap between some of the coded and un-coded documents is sufficient to support a preliminary finding that the presentations' audiences as well as a judicial fact finder would be able to understand which physicians' rates and volumes appear in the documents.

Other documents are relevant because they discuss Memorial Hermann's plans to differentiate itself from other hospitals' cardiovascular surgery departments. This focus could make more or less probable the likelihood that Dr. Gomez's unique services were of sufficient importance to provide the impetus for the alleged improper conduct.

Another category of relevant documents consists of maps that identify the locations of doctors or hospitals in the surrounding geographic area, and maps demarcating the geographic areas from which Memorial Hermann draws its patients. Because they provide a basis for

determining the feasibility of alternatives for patients in the area, these documents—in conjunction with expert testimony—could make a particular geographic market for Dr. Gomez's claims under the TFEAA more or less probable.

On the other hand, Exhibit B to E. Leticia Mireles' affidavit, which consists of an email to a number of persons, is not relevant to Dr. Gomez's allegations. The body of the email does not include any information that would make any of Dr. Gomez's allegations more or less probable. Although the email includes an attachment, nothing before us suggests that a record of the sending of this particular attachment to a number of persons would make Dr. Gomez's allegations more or less probable, because the attachment itself does not contain any data about Dr. Gomez or a relevant competitive market. This email, appearing on pages 365–68 of the sealed record, is therefore not relevant to an anticompetitive action, and retains its protection under the medical peer review committee privilege.

In addition, the documents appearing on pages 119, 122–23, 129–30, 135, 138, 140, 142, 145, 154–55, 160–61, 166-67, 174–75, 180–81, 188–89, 195–98, and 243 of the sealed record also retain their protection under the medical peer review committee privilege. These documents do not discuss any data on mortality rates, physician volume, or referral pattern. Nor do they discuss plans to disseminate such data, any staffing concerns of the hospital, or the competitive positions of the hospital or Dr. Gomez. These documents lack any apparent relevance to Dr. Gomez's claims, and we hold the trial court therefore abused its discretion in compelling Memorial Hermann to produce them.

However, the trial court did not abuse its discretion in making a preliminary finding that the other materials in the record are relevant to an anticompetitive action. We therefore turn to whether these documents enjoy any residual protection under the medical committee privilege.

**III.    When both are applicable, the anticompetitive exception to the medical peer review committee privilege limits the provision of confidentiality under the medical committee privilege.**

This question is contingent on the extent to which overlapping provisions of two different statutes can concurrently operate.[144] To the extent possible, we will construe the different provisions in a way that harmonizes rather than conflicts.[145] When the provisions are irreconcilable, the general rule is that the terms of the later-enacted statute should control.[146] However, conflicts between general and specific provisions favor the specific, and when the literal terms of the two provisions cannot both be true, the terms of the specific provision ordinarily will prevail.[147] We will construe the general provision as controlling only when the manifest intent is that the general provision will prevail and the general provision is also the later-enacted statute.[148]

Section 161.031 of the Health and Safety Code broadly defines a "medical committee" to include "any committee, including a joint committee" of certain types of entities, including "a hospital" or "a medical organization."[149] Medical committees may be "appointed ad hoc to conduct

---

[144] *See City of Waco v. Lopez*, 259 S.W.3d 147, 153 (Tex. 2008).

[145] TEX. GOV'T CODE §§ 311.025, 311.026(a); *Tex. Indus. Energy Consumers v. CenterPoint Energy Hous. Elec., LLC*, 324 S.W.3d 95, 107 (Tex. 2010).

[146] TEX. GOV'T CODE § 311.025(a); *Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 297 (Tex. 2011).

[147] TEX. GOV'T CODE § 311.026(b); *TracFone Wireless, Inc. v. Comm'n on State Emergency Commc'ns*, 397 S.W.3d 173, 181 (Tex. 2013).

[148] TEX. GOV'T CODE § 311.026(b); *Lopez*, 259 S.W.3d at 153.

[149] TEX. HEALTH & SAFETY CODE § 161.031(a). The other categories of entities include university medical schools and health science centers, health maintenance organizations licensed under Chapter 843 of the Insurance Code, extended care facilities, hospital districts, and hospital authorities. *Id.* § 161.031(a)(3)–(7).

a specific investigation or established . . . under the bylaws or rules of the organization or institution."[150]

The records and proceedings of a medical committee are governed by section 161.032 of the Health and Safety Code. With the exception of "records maintained in the regular course of business by a hospital . . . [or] medical organization,"[151] medical committees and their members may use the committee's records and proceedings "only in the exercise of proper committee functions."[152] Subject to the same exception,[153] the "records and proceedings of a medical committee are confidential and are not subject to court subpoena."[154]

Section 161.032 of the Health and Safety Code suggests that medical committees are at least potentially distinct from medical peer review committees.[155] However, the definitions of the two committees contain significant overlap. Provided that the other statutory requirements are met,[156] the definition of a medical peer review committee includes committees "of a health care

---

[150] *Id.* § 161.031(b).

[151] *Id.* § 161.032(f).

[152] *Id.* § 161.032(d).

[153] *Id.* § 161.032(f).

[154] *Id.* § 161.032(a).

[155] *See id.* § 161.032(b)(1) (proving that "a proceeding of a medical peer review committee . . . *or* medical committee" may be held in a closed meeting (emphasis added)); *id.* § 161.032(b)(2) (providing for closed meetings of the governing board of certain hospitals or health maintenance organizations if at the meeting, "the governing body receives records, information, or reports provided by a medical committee [*or*] medical peer review committee"); *id.* § 161.032(c) (providing that the "[r]ecords, information, or reports of a medical committee [*or*] medical peer review committee" as well as "records, information or reports provided by a medical committee [*or*] medical peer review committee . . . to the governing board of a public hospital, hospital district, or hospital authority" are exempt from the disclosure provisions of Chapter 552 of the Government Code).

[156] In order to be considered a medical peer review committee, the committee must (1) "operate[] under written bylaws approved by the policy-making board or the governing board of the health care entity" and (2) be "authorized to evaluate the quality of medical and health care services or the competence of physicians." TEX. OCC. CODE § 151.002(a)(8).

entity, the governing board of a health care entity, or the medical staff of a health care entity."[157]
But any "entity . . . that provides or pays for medical care or health services" and "follows a formal peer review process to further quality medical care or health care" will be considered a health care entity.[158]

As such, although the committees of some health care entities may not be medical committees,[159] every committee of every entity listed in the definition of a medical committee that "follows a formal peer review process to further quality medical care or health care"[160] will be considered a medical peer review committee—unless the committee does not "operate[] under written bylaws approved by the policy-making board or the governing board of the health care entity."[161] By extension, no medical committee that satisfies these two additional provisions necessary to be deemed a medical peer review committee can credibly claim that its records and proceedings are not governed by section 160.007 of the Occupations Code.[162]

---

[157] *Id.*

[158] *Id.* § 151.002(a)(5).

[159] By way of example, "a health care collaborative certified under Chapter 848, Insurance Code" is specifically designated as a health care entity, TEX. OCC. CODE § 151.002(a)(5)(E), but such entities would not fall neatly within any of the entity categories listed in the definition of a medical committee. *Compare id. with* TEX. HEALTH & SAFETY CODE § 161.031(a)(1)–(8). *But see Brooks*, 926 S.W.2d at 20 ("[T]he statutory definition of "medical committee" is broad . . . That definition encompasses a medical peer review committee. . . .").

[160] TEX. OCC. CODE § 151.002(a)(5)(B)(ii).

[161] *Id.* § 151.002(a)(8). In other words, any medical committee that both "operates under written bylaws" approved by either its policy-making or governing board, and follows a formal peer review process will also be considered a medical peer review committee. *Id.*

[162] There is only one potential exception to this rule, and that exception applies to the records and proceedings of governing bodies of "public hospital[s] owned or operated by a governmental entity, . . . hospital authorit[ies] created under Chapter 262 or 264, Health and Safety Code, . . . [or] hospital district[s] created under Article IX, Texas Constitution." TEX. OCC. CODE § 151.002(a)(8)(B). These governing bodies are considered to be medical peer review committees only in relation to their evaluation of the quality of the medical and health care services they provide or a physician's competence—and only "to the extent that the evaluation . . . involves discussions or records that specifically or necessarily identify an individual patient or physician." *Id.* § 151.002(a)(8)(B)(i)–(ii). Thus, none of the governing bodies' records or proceedings that does not "specifically or necessarily identify an individual patient

Here, because Memorial Hermann stipulated that the relevant committees are medical peer review committees, the documents at issue cannot be considered confidential under section 161.032(a) of the Health and Safety Code without ignoring section 160.007 of the Occupations Code. Memorial Hermann's argument that a document should enjoy the combined protection of all applicable privileges relies on our previous references to section 161.032 of the Health and Safety Code and section 160.007 of the Occupations Code as "the medical committee privilege" and "the medical peer review committee privilege," respectively.[163] However, the statutes themselves confer confidentiality on records and proceedings—not the committee itself.[164] Because the records and proceedings here are subject to both sections, both sections' provisions regarding confidentiality apply. That the records and proceedings of some medical peer review committees may not be considered records and proceedings of a medical committee—or the reverse—has no bearing on the question before us, because such documents would never be subject to both sections.

Because the documents are subject to both sections, any reconcilable provisions will apply in concert.[165] For example, a medical committee that is also a medical peer review committee could not use its records or proceedings in the exercise of improper committee functions simply because

---

or physician," *id.* § 151.002(a)(8)(ii), would be subject to section 160.007 of the Occupations Code, although they would still enjoy the protections of section 161.032 of the Health and Safety Code.

[163] *See, e.g.*, *In re Living Ctrs. of Tex., Inc.*, 175 S.W.3d at 256.

[164] *See* TEX. HEALTH & SAFETY CODE § 161.032(a) ("*The records and proceedings* of a medical committee are confidential and are not subject to court subpoena." (emphasis added)); TEX. OCC. CODE § 160.007(a) ("Except as otherwise provided by this subtitle, *each proceeding or record* of a medical peer review committee is confidential, and any communication made to a medical peer review committee is privileged." (emphasis added)).

[165] *See Lopez*, 259 S.W.3d at 153.

section 160.007 does not explicitly forbid it.[166] By the same token, a dual medical committee and medical peer review committee could not rely on the provision of confidentiality in section 161.032(a) to shirk its duty under section 160.007(d) to provide a physician with a written copy of its recommendation to suspend the physician's privileges.[167]

However, a record or proceeding is either confidential or not; it cannot be both. As we have already discussed at length, the majority of the documents that Dr. Gomez seeks are relevant to an anticompetitive action. Because Memorial Hermann has stipulated that those documents are the records and proceedings of a medical peer review committee, section 160.007(b) provides that those documents are "not confidential to the extent [they are] considered relevant."[168] It is impossible to reconcile that provision with a provision stating that the same documents "are confidential and are not subject to court subpoena."[169] Section 160.007 is both the later enacted statute as well as the more specific regarding when records and proceedings are confidential.[170] We therefore hold that the records and proceedings of a dual medical committee and medical peer review committee do not enjoy any greater confidentiality under section 161.032(a) than they do under section 160.007(b).

## CONCLUSION

We hold that the trial court abused its discretion in ordering Memorial Hermann to produce pages 119, 122–23, 129–30, 135, 138, 140, 142, 145, 154–55, 160–61, 166–67, 174–75, 180–81, 188–89, 195–98, 243, and 365–68 of the sealed record. We conditionally grant Memorial

---

[166] *See* TEX. HEALTH & SAFETY CODE § 161.032(d).

[167] *See* TEX. OCC. CODE § 160.007(d).

[168] *Id.* § 160.007(b).

[169] TEX. HEALTH & SAFETY CODE § 161.032(a).

[170] *See* TEX. GOV'T CODE §§ 311.025(a); 311.026(b).

Hermann's writ of mandamus, directing the trial court to modify its discovery order insofar as the order compelled production of those documents. We are confident the trial court will comply, and the writ will issue only if it does not. In all other respects, Memorial Hermann's petition for writ of mandamus is denied.

_____
Don R. Willett
Justice

**OPINION DELIVERED:** May 22, 2015