# Supreme Court of Texas

### No. 19-1104

Nicky E. Dyer, Flora Harrell, Edgar Hoagland, Shirley Hoagland, James Langston, James A. Langston, III, Lois Nelson, Brian Rodel, Richard Ward, Edward A. (Art) Wilson, Montgomery County, and City of Conroe,

*Petitioners*,

v.

Texas Commission on Environmental Quality and TexCom Gulf Disposal, LLC,

*Respondents*

On Petition for Review from the
Court of Appeals for the Third District of Texas

**Argued January 12, 2022**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

Class I underground injection-control wells manage industrial waste by injecting it thousands of feet underground. But these injection wells could potentially harm important subsurface resources—namely drinking water and petroleum. To "maintain the quality of fresh water in the state to the extent consistent with the public health . . . and the

operation of existing industries,"[1] these injection wells undergo an extensive permitting process with the Texas Commission on Environmental Quality (TCEQ). A permit application cannot get off the starting blocks unless accompanied by a letter from the Railroad Commission (RRC) concluding that the proposed wells "will not endanger or injure any known oil or gas reservoir."[2]

In this case, RRC issued such a letter but then rescinded it after six years of administrative hearings, around the same time TCEQ issued its final order granting the permit application. We conclude that the rescission did not deprive TCEQ of jurisdiction, and that on the facts of this case, TCEQ did not violate the Texas Administrative Procedure Act (APA)[3] by declining to reopen the administrative record for further proceedings. We overrule petitioners' remaining challenges to TCEQ's order and affirm the judgment of the court of appeals.[4]

## I

The Injection Well Act (IWA) governs the permitting process for injection wells in the state.[5] TCEQ has jurisdiction over wells that dispose of industrial and municipal waste, while RRC has jurisdiction over wells that dispose of oil-and-gas waste. Class I wells, the type at issue here, fall under TCEQ's jurisdiction. But the IWA still requires RRC involvement in the permitting process for Class I wells. TCEQ

---

[1] TEX. WATER CODE § 27.003.

[2] *Id.* § 27.015(a).

[3] TEX. GOV'T CODE §§ 2001.001-2001.903.

[4] 639 S.W.3d 721 (Tex. App.—Austin 2019) (2-1).

[5] TEX. WATER CODE §§ 27.001-27.207.

"may not proceed to hearing on any issues other than preliminary matters"[6] until the applicant submits a letter from RRC "concluding that drilling or using the disposal well and injecting industrial and municipal waste into the subsurface stratum will not endanger or injure any known oil or gas reservoir."[7]

After receiving this no-harm letter, TCEQ's process may begin in earnest. Before granting a permit, TCEQ must make several findings, including that (1) "the injection well is in the public interest;" (2) "no existing rights, including . . . mineral rights, will be impaired;" and (3) "both ground and surface fresh water can be adequately protected from pollution".[8] TCEQ regulations flesh out these statutory directives by enumerating materials that TCEQ "shall consider . . . before issuing a Class I Injection Well Permit",[9] including geological maps, plans, and data to determine whether a given area is "geologically suitable" for an injection well.[10] A key question to geological suitability is whether the underground rock formations will confine the injected waste, keeping it clear from underground sources of drinking water.

An applicant must specify both an *injection zone* and an *injection interval*. The injection zone is defined as "[a] formation, a group of formations, or part of a formation that receives fluid through a well."[11]

---

[6] *Id.* § 27.015(b).

[7] *Id.* § 27.015(a).

[8] *Id.* § 27.051(a)(1)-(3).

[9] 30 TEX. ADMIN. CODE § 331.121(a).

[10] *Id.* § 331.121(c)(2).

[11] *Id.* § 331.2(60).

In layman's terms, it is the area where the waste is permitted to flow. The injection interval is the portion of the injection zone where the well is perforated and the waste is directly placed.[12]

TCEQ "may" hold a hearing on a permit application "[i]f it is considered necessary and in the public interest," but TCEQ "shall" hold a hearing if one "is requested by a local government located in the county of the proposed disposal well site or by an affected person",[13] which TCEQ regulations define as "[a]ny person who has a personal justiciable interest related to a legal right, duty, privilege, power, or economic interest affected by the proposed injection operation for which a permit is sought."[14] These contested case hearings are formal, trial-like proceedings held before administrative law judges from the State Office of Administrative Hearings (SOAH).[15] When "referring a matter for hearing," TCEQ provides SOAH with "a list of disputed issues."[16] Before testimony can begin, there must be evidence "that proper notice regarding the hearing was given to affected persons."[17] After the close of evidence, SOAH submits a proposal for decision (PFD) to TCEQ.[18] The

---

[12] *Id.* § 331.2(57).

[13] TEX. WATER CODE § 27.018(a).

[14] 30 TEX. ADMIN. CODE § 331.2(3).

[15] *See* TEX. GOV'T CODE § 2003.047(a) (providing that SOAH "shall perform contested case hearings" for TCEQ).

[16] *Id.* § 2003.047(e).

[17] TEX. WATER CODE § 27.018(c).

[18] TEX. GOV'T CODE § 2003.047(*l*).

4

parties file briefs for or against it, and TCEQ issues a final order on the permit.[19]

## II

## A

TexCom Gulf Disposal, LLC[20] sought to develop a commercial-waste-disposal facility on a 27-acre site in Montgomery County, near the city of Conroe. The selected site had one nonoperative injection well already constructed. In 2005, TexCom applied to TCEQ for permits to operate this existing well and construct up to three additional wells. These wells would dispose of nonhazardous industrial wastewater, hauled to the facility from across the region.

The site is situated within the Conroe Oil Field and sits immediately atop an aquifer system. Montgomery County relies on this aquifer system as its sole source of drinking water. Directly beneath the aquifer system is the Jackson Shale—a 1,000-foot-thick sedimentary formation with a dough-like consistency.

Beneath the Jackson Shale lies the Cockfield Formation, which is made up of three distinct layers: the Upper Cockfield (5,134 to 5,629 feet below the surface), the Middle Cockfield (5,629 to 6,045 feet), and the Lower Cockfield (6,045 to 6,390 feet). Each Cockfield layer is separated by a layer of shale, and there is another massive shale layer beneath the Lower Cockfield. TCEQ describes the Cockfield Formation with the

---

[19] *Id.* § 2003.047(*l*)-(m).

[20] While this litigation was pending, TexCom was renamed Union Processing Systems. We will continue to refer to this respondent as TexCom, as the parties do in their briefs.

analogy of a three-layer cake that has layers of shale (icing) between each cake layer and additional layers of shale on top and on bottom.

**B**

TexCom's permit application included an RRC no-harm letter, as required by statute. TexCom's application represented that it owned the mineral rights underneath the site, when in fact an entity called Sabine Royalty Trust owned the mineral rights under the site and the right to receive royalties associated with them. Because Sabine was not identified as an affected person in TexCom's application, it was not given formal notice of the proceedings as required by the IWA.

TCEQ's Executive Director made a preliminary decision to approve the application and prepared draft permits, specifying the entire Cockfield Formation as the injection zone and the Lower Cockfield specifically as the injection interval. Montgomery County, the City of Conroe, the Lone Star Groundwater Conservation District, TCEQ's Public Interest Counsel, and several individuals opposed the application. They argued that the wells would harm the underground sources of drinking water and that less harmful alternative disposal options existed.

In 2007, SOAH conducted a contested case hearing and issued a PFD in 2008 recommending that TexCom's permits be granted, but with special conditions. Instead of granting the permits, TCEQ remanded the matter to SOAH with instructions to consider evidence of new modeling, the public interest, and alternative disposal options.

After the remand but before a new contested case hearing could be held, Denbury Onshore acquired mineral leases in the Conroe Oil

6

Field within TexCom's proposed injection zone. Denbury then initiated proceedings at RRC to have the 2005 no-harm letter rescinded and, over TexCom's objections, intervened in the contested case proceedings before SOAH.

While Denbury's request to RRC was pending, the second contested case hearing at SOAH was held between June and September 2010, with Denbury as a party. In November, SOAH issued an amended PFD, this time recommending that TCEQ deny TexCom's permit application. That same month, after an evidentiary hearing, examiners at RRC issued a PFD recommending that the 2005 no-harm letter be rescinded. The RRC examiners concluded that TexCom's proposed waste-injection activities would endanger or injure a known oil or gas reservoir.

Two months later, on January 13, 2011, while SOAH's amended PFD was still pending before TCEQ, RRC issued a final order adopting the findings and conclusions in the examiners' PFD and rescinding the 2005 no-harm letter. The order's effective date was delayed some 90 days to give the parties an opportunity to seek rehearing. The protesting parties moved to reopen the administrative record and include RRC's final order. They also brought RRC's final order to TCEQ's attention through their exceptions to SOAH's amended PFD, filed with TCEQ.

Two weeks later, TCEQ held an open meeting on TexCom's application and SOAH's amended PFD. At this meeting, the protesting parties again raised the issue of RRC's not-yet-effective final order rescinding the 2005 no-harm letter. Despite SOAH's recommendation that TexCom's permit application be denied, TCEQ voted to approve

7

TexCom's permits. TCEQ issued a revised order on April 8, 2011, changing some of SOAH's findings and granting TexCom's application. RRC's rescission of the 2005 no-harm letter became effective on April 18, 2011.

## C

Petitioners and other parties filed suit in the district court for judicial review of TCEQ's order under the APA.[21] Sabine Royalty Trust also sued for declaratory relief, arguing that TCEQ had acted ultra vires by deciding on TexCom's application without giving Sabine the IWA-required notice of proceedings. TexCom intervened to defend TCEQ's order. The suits were consolidated in the trial court.

The trial court denied TCEQ's and TexCom's pleas to the jurisdiction, which had sought to dismiss Sabine's claims as well as claims by other plaintiffs that were based on Sabine's lack of notice. The court of appeals reversed, holding that: (1) the IWA's requirement of notice to affected persons before an application may be heard is not jurisdictional;[22] (2) Sabine judicially admitted to having actual notice of the administrative proceedings in June 2010 and failed to exhaust administrative remedies that were still available to it;[23] and (3) the other plaintiff–appellees lacked standing to complain about Sabine's

---

[21] *See* TEX. GOV'T CODE §§ 2001.171-2001.176 (providing for judicial review).

[22] *Tex. Comm'n on Env't Quality v. Denbury Onshore, LLC*, No. 03-11-00891-CV, 2014 WL 3055912, at *5-6 (Tex. App.—Austin July 3, 2014, no pet.).

[23] *Id.* at *6, 9.

8

lack of statutory notice because they were not personally injured by it.[24] The court dismissed all of Sabine's claims and the claims of other plaintiffs complaining of Sabine's lack of notice.[25] None of the plaintiff–appellees sought review in this Court.

On remand, the trial court affirmed TCEQ's order and denied plaintiffs' claims for declaratory relief. The City of Conroe, Montgomery County, and the individual plaintiffs appealed.[26] A divided court of appeals affirmed,[27] and we granted the plaintiffs' petition for review.[28]

### III

Under the APA, "[a] person who has exhausted all administrative remedies available within a state agency and who is aggrieved by a final decision in a contested case"[29] may challenge that decision by petitioning for judicial review in a Travis County district court within the time specified in the Act.[30] The trial court decides the challenge without a

---

[24] *Id.* at *10 (citing *Heckman v. Williamson County*, 369 S.W.3d 137, 154-155 (Tex. 2012)).

[25] *Id.*

[26] Denbury is no longer a party in this case. Although Denbury filed a notice of appeal, it then filed a motion in the court of appeals to dismiss its appeal, which was granted.

[27] 639 S.W.3d 721 (Tex. App.—Austin 2019) (2-1).

[28] After the City of Conroe and Montgomery County filed a joint petition for review in this Court, the individual plaintiff–petitioners filed a letter adopting the petition filed by the City and the County. The individual petitioners are Nicky E. Dyer, Flora Harrell, Edgar Hoagland, Shirley Hoagland, James Langston, James A. Langston, III, Lois Nelson, Brian Rodel, Richard Ward, and Edward A. (Art) Wilson.

[29] TEX. GOV'T CODE § 2001.171.

[30] *Id.* § 2001.176(a)-(b).

9

jury based on the administrative record and any additional evidence allowed by the court.[31] The trial court

(1) may affirm the agency decision in whole or in part; and

(2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(A) in violation of a constitutional or statutory provision;

(B) in excess of the agency's statutory authority;

(C) made through unlawful procedure;

(D) affected by other error of law;

(E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.[32]

The question of whether an agency's decision violates one of these grounds is a question of law.[33]

Petitioners raise several challenges to TCEQ's 2011 order

---

[31] *Id.* § 2001.175(c)-(e).

[32] *Id.* § 2001.174.

[33] *See, e.g.*, *Tex. Comm'n on Env't Quality v. Maverick County*, 642 S.W.3d 537, 547 (Tex. 2022) ("The question whether an agency's determination meets the substantial-evidence standard is one of law." (cleaned up)); *Tex. Dep't of Pub. Safety v. Valdez*, 956 S.W.2d 767, 769 (Tex. App.—San Antonio 1997, no pet.) ("Each of the grounds for reversal listed in section 2001.174(2), including substantial evidence review, presents a question of law.").

approving TexCom's permit application.[34] We will first address petitioners' procedural challenges to the order and the administrative process that produced it[35] and then the challenges to the substance of the order.

## IV

## A

Petitioners raise two challenges to the order based on RRC's rescission of the no-harm letter.[36] They argue first that TCEQ's order is

---

[34] The permits that are the subject of this appeal had an effective time of ten years. TexCom began the renewal process while this litigation has been pending. In June 2021, RRC issued four no-harm letters to TexCom with respect to its permit-renewal application. TexCom's existing permits "remain in full force and effect and will not expire until commission action on the application for renewal is final." 30 TEX. ADMIN. CODE § 305.63(a)(4). The parties agree that the 2021 no-harm letters should not affect our resolution of petitioners' challenges to the 2011 order. We agree too; the letters play no part in our decision.

[35] Included in petitioners' procedural challenges is the argument that respondents' failure to mail mineral-interest-owner Sabine Royalty Trust notice of the contested case proceedings prior to SOAH's hearing evidence in 2007, as required by Section 27.018(c) of the IWA, renders TCEQ's 2011 order void. *See* TEX. WATER CODE § 27.018(c); 30 TEX. ADMIN. CODE § 39.651(c)(4)(C)-(D). The court of appeals rejected this argument on several bases. *See Denbury Onshore*, 2014 WL 3055912, at *6-10. We agree with the court of appeals' conclusion that respondents' failure to mail notice to Sabine does not provide a basis for reversal of TCEQ's order here.

[36] Respondent TCEQ argues that petitioners lack "standing" to assert any challenge to TCEQ's order based on RRC's rescission of the 2005 no-harm letter because, as nonmineral owners, they cannot meet the requirement for relief in Section 2001.174(2) that their "substantial rights . . . have been prejudiced" by the TCEQ order's being consistent with the 2005 letter. In recent cases we have "discouraged the use of the term *standing* to describe extra-constitutional restrictions on the right of a particular plaintiff to bring a particular lawsuit." *Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*, 616 S.W.3d 558, 567 (Tex. 2021) (citing *Pike v. EMC Mgmt., LLC*, 610 S.W.3d 763,

11

void because the IWA makes both the issuance and the continued effectiveness of a no-harm letter jurisdictional—or at least mandatory—requirements for TCEQ to approve an injection-well permit. Alternatively, petitioners contend that TCEQ "acted arbitrarily and capriciously and abused its discretion" by not reopening the record and considering RRC's rescission before issuing its final order.

**1**

Petitioners' jurisdictional argument is based primarily on Sections 27.015(a) and (b) of the Water Code, which require an applicant to "submit with the application" a no-harm letter from RRC and prohibit TCEQ from hearing "any issues other than preliminary matters such as notice" until the no-harm letter is submitted:

(a)  A person making application to the commission for a disposal well permit under this chapter *shall submit with the application a letter from the railroad commission* concluding that drilling or using the disposal well and injecting industrial and municipal waste into the subsurface stratum will not endanger or injure any known oil or gas reservoir.

(b)  In a hearing on an application for a disposal well permit under this chapter, *the commission may not proceed to hearing on any issues other than preliminary matters* such as notice *until the letter* required from the railroad commission under

774 (Tex. 2020)). "[T]he question whether a plaintiff has established his right 'to go forward with [his] suit' or 'satisfied the requisites of a particular statute' pertains 'in reality to the right of the plaintiff to relief rather than to the [subject-matter] jurisdiction of the court to afford it.'" *Pike*, 610 S.W.3d at 774 (second and third brackets in original) (quoting *Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 76-77 (Tex. 2000)). Because TCEQ's argument pertains to the right of petitioners to relief under the APA, and not the courts' subject-matter jurisdiction to hear their claims, we need not address it.

Subsection (a) of this section *is provided* to the commission.[37]

Section 27.051(a) states that TCEQ "may grant an application . . . and may issue the permit if it finds", among other things, "that no existing rights, including . . . mineral rights, will be impaired".[38] Section 27.015(c) states that TCEQ "shall" make that finding as to oil or gas rights if RRC has issued a no-harm letter.[39]

The court of appeals concluded that petitioners' "proposed interpretation of section 27.015 goes beyond the express statutory language."[40] Section 27.015(b) simply says that TCEQ "may not proceed to [a] hearing" on anything other than preliminary issues until a no-harm letter is on file. The no-harm letter issued by RRC in 2005 was on file with TCEQ when SOAH began the first contested case hearing in 2007. RRC issued an order rescinding the 2005 letter on January 13, 2011, but the effectiveness of that order was delayed 90 days to allow time for rehearing proceedings. The order was not yet effective—and the 2005 letter remained in effect—when TCEQ issued its final order approving TexCom's permit application on April 7. Thus, the plain language of Section 27.015(b) was satisfied here.

---

[37] TEX. WATER CODE § 27.015(a)-(b) (emphases added).

[38] *Id.* § 27.051(a)(2).

[39] *See id.* § 27.015(c) ("The commission shall find that there will be no impairment of oil or gas mineral rights if the railroad commission has issued a letter under Subsection (a) that concludes that drilling and using the disposal well will not endanger or injure any known oil or gas reservoir.").

[40] 639 S.W.3d at 732.

13

There is no "explicit language"[41] in the IWA indicating that the Legislature intended the draconian and inefficient consequence of petitioners' argument—that RRC's rescission of a no-harm letter six years after it was issued voids a TCEQ order granting a permit application issued in the meantime. And we "have no right to engraft upon the statute any conditions or provisions not placed there by the legislature."[42] We hold that, even if Section 27.015 is jurisdictional, RRC's rescission of the 2005 no-harm letter did not void TCEQ's already-final order and the contested case proceedings giving rise to it for lack of jurisdiction.

In a related argument, petitioners contend that even if TCEQ had jurisdiction, TexCom's application still became statutorily deficient when RRC issued its notice of recission. We disagree for the reasons discussed above. The requirements of Section 27.015 were plainly satisfied in this case.

**2**

Petitioners say, alternatively, that TCEQ acted arbitrarily or capriciously or abused its discretion[43] by refusing to reopen the record and undergo more proceedings in light of RRC's rescission of the 2005 no-harm letter. It is undisputed that TCEQ was aware of RRC's issued-

---

[41] *See City of DeSoto v. White*, 288 S.W.3d 389, 395 (Tex. 2009) ("The Code does not contain any explicit language indicating that this notice requirement is jurisdictional.").

[42] *Iliff v. Iliff*, 339 S.W.3d 74, 80-81 (Tex. 2011) (quoting *Duncan, Wyatt & Co. v. Taylor*, 63 Tex. 645, 649 (1885)).

[43] TEX. GOV'T CODE § 2001.174(2)(F).

but-not-yet-effective order rescinding the 2005 letter before TCEQ issued its own order.

The court of appeals listed six reasons why the record cuts against petitioners' argument, some of which we have reworded for brevity and clarity:

(i)     the rescission did not take effect until four years after contested case proceedings began;

(ii)     no mineral-interest owner intervened as a party until Denbury did so in 2010;

(iii)     "the no-harm letter was admitted during the 2007 hearing without objection and, thus, was properly considered as evidence before [SOAH]";

(iv)     "the 2010 hearing on remand was expressly limited to specified topics that did not include impairment of mineral rights";

(v)     "the administrative record was completed and closed in 2010"; and

(vi)     TCEQ voted to approve TexCom's permit application in January 2011, months before the rescission took effect.[44]

The Legislature has given RRC an important role to play in the injection-well-permitting process. An application cannot proceed until RRC has "conclud[ed] that drilling or using the disposal well and injecting industrial and municipal waste into the subsurface stratum will not endanger or injure any known oil or gas reservoir."[45] Moreover, a conclusion of no harm by RRC is binding on TCEQ, for at least some applications—Section 27.015(c) states that TCEQ "shall find that there

---

[44] *See* 639 S.W.3d at 734.

[45] TEX. WATER CODE § 27.015(a).

15

will be no impairment of oil or gas mineral rights if the railroad commission has issued a [no-harm] letter".[46] But these statutory requirements were satisfied here by the 2005 no-harm letter, which remained in effect until the administrative record had been closed and TCEQ had issued its final order on TexCom's permit application.

We agree that TCEQ is statutorily required to take into account RRC's conclusion about whether a proposed injection well would endanger known oil or gas reservoirs. This includes a change in RRC's position, especially when the change is precipitated by evidence that was not presented in the original RRC proceeding due to a party's lack of notice. And an agency decision is arbitrary if the agency "failed to consider a factor the legislature directs it to consider".[47] But based on the thorough record and unique facts before us, we cannot say that TCEQ acted arbitrarily or capriciously or abused its discretion by failing in 2011 to reopen the administrative record to conduct further proceedings on RRC's rescission of a no-harm letter issued in 2005.

---

[46] *Id.* § 27.015(c). We note the parties' dispute over whether an uncodified session law limits the applicability of Section 27.015(c) to applications that were pending on June 1993. Act of May 31, 1993, 73d Leg., R.S., ch. 802, § 8, 1993 Tex. Gen. Laws 3195, 3197 ("Section 27.015(c), Water Code, as added by this Act, applies only to an application before [TCEQ] which is pending on the effective date of this Act."). We do not decide the issue here. If Section 27.015(c) does apply to TexCom's application, as petitioners urge, then TCEQ complied—RRC had issued a no-harm letter, which was still effective, so TCEQ found no impairment of mineral rights.

[47] *Pub. Util. Comm'n v. Tex. Indus. Energy Consumers*, 620 S.W.3d 418, 427 (Tex. 2021) (quoting *City of El Paso v. Pub. Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994)).

16

On remand at SOAH, Denbury presented much of the same evidence that convinced RRC to change its mind, despite TexCom's objections that such evidence exceeded the limited scope of the remand. The ALJs directly addressed Denbury's evidence in their amended PFD, placing it front-and-center in TCEQ's review of the record. TCEQ could have reasonably concluded that a remand to SOAH would have simply strained the time and resources of both the parties and the State without a change to the evidentiary landscape.

In sum, even if TCEQ were not bound by RRC's still-effective no-harm letter by virtue of Section 27.015(c), it did not abuse its discretion by declining to reopen the administrative record to rehear evidence that it had already considered. It was within TCEQ's discretion to balance these various considerations and leave the record closed.[48]

**B**

Petitioners next challenge the changes that TCEQ made between its February 2011 order and its April 2011 order. At the January 2011 public meeting, the Commissioners voted to "adopt TexCom's proposed revisions" to the PFD, "grant TexCom's . . . permit application", and "issue the . . . draft permits for [the injection wells]". This decision was memorialized in the February 2011 order. But the findings of fact in the February 2011 order inconsistently listed TexCom's injection zone as

---

[48] *See* 30 TEX. ADMIN. CODE § 80.265 ("[TCEQ] . . . *may* order [SOAH] to reopen the record for further proceedings on specific issues in dispute." (emphasis added)). We reiterate that our holding is based on the unique facts of this case, where the parties with mineral interests, although not given proper notice, still had the opportunity to substantively participate in the TCEQ hearing process.

17

both: (1) the entire Cockfield Formation, and (2) only the Lower Cockfield. The February 2011 order then granted the permits with specific additional conditions, which did not include changing the injection zone.[49]

Without a public meeting, TCEQ revised its order in April 2011. The revision included a letter from TCEQ's general counsel explaining that the revision corrected "clerical errors that were not consistent with [TCEQ's] deliberations and decision" at the January meeting. Among other typographical corrections, the revised order modified the inconsistent findings of fact that listed the injection zone as only the Lower Cockfield. Since this revision did not occur following a properly noticed open meeting, petitioners argue that TCEQ acted improperly in issuing the revised order—either by violating the Open Meetings Act,[50] or by acting through one commissioner, individually, instead of the body as a whole.[51]

---

[49] The additional conditions primarily involved monitoring, testing, and modeling requirements, as well as a condition requiring the relocation of the facility entrance.

[50] TEX. GOV'T CODE §§ 551.001-551.146. The Open Meetings Act generally requires that TCEQ deliberations between commissioners regarding public business be properly noticed and open to the public. *See id.* § 551.002 ("Every regular, special, or called meeting of a governmental body shall be open to the public, except as provided by this chapter.").

[51] TCEQ orders must be issued by the body as a whole, not by a single member. *See* TEX. WATER CODE § 5.058(e); *Webster v. Tex. & Pac. Motor Transp. Co.*, 166 S.W.2d 75, 76 (Tex. 1942) ("It is a well[-]established rule in this State . . . that where the Legislature has committed a matter to a board, bureau, or commission, or other administrative agency, such board, bureau, or commission must act thereon as a body at a stated meeting, or one properly called . . . .").

It is undisputed that TCEQ properly held a public meeting and acted as a body in granting TexCom's permit application. TCEQ's next job was to put its order in writing.[52] After a TCEQ decision is memorialized in a written order, TCEQ's general counsel has the authority to make clerical changes to that order.[53]

The April order does not substantively change TCEQ's expressed intention at the January open meeting. Instead, it conforms the written order to it. At the meeting, the commissioners voted to "issue the [executive director's] draft permits" for the injection wells, not specifying any change to the injection zone. These draft permits listed the injection zone as the entire Cockfield Formation. TCEQ's general counsel acted within its delegated authority to make clerical corrections in order to conform the inconsistent findings of fact with TCEQ's clearly stated decision at the open meeting.

## V

We now turn to the substance of the order. TCEQ changed a number of SOAH's findings of fact, and made additional findings based on evidence in the record. Petitioners bring three challenges to TCEQ's authority to make these changes. First, petitioners argue that TCEQ

---

[52] TEX. GOV'T CODE § 2003.047(m) ("The commission shall serve a copy of the commission's order, including its finding of facts and conclusions of law, on each party.").

[53] *See* TEX. WATER CODE § 5.110(d) ("The general counsel shall perform the duties and may exercise the powers specifically authorized by this code or delegated to the general counsel by [TCEQ]."); Tex. Comm'n on Env't Quality, Docket No. 2009-0059-RES (Feb. 2, 2009) (delegating to the general counsel the "[a]uthority to make clerical and clarification changes to Orders and documents adopted by [TCEQ], to effectuate the clear intent of [TCEQ's] action taken").

19

only has the statutory authority to amend technical errors or incorrect applications of law. Second, petitioners contend that TCEQ's explanation for its changes was statutorily inadequate. Finally, petitioners argue that many findings of fact crucial to TCEQ's decision were not supported by substantial evidence. We take each contention in turn.

## A

### 1

To begin, petitioners rely on Section 2001.058(e) of the APA to urge that TCEQ overstepped its statutory authority to change SOAH's findings of fact. Agencies subject to Section 2001.058(e) may only alter a finding of fact or conclusion of law if the agency determines:

(1) that the administrative law judge did not properly apply or interpret applicable law, agency rules, written policies provided under Subsection (c), or prior administrative decisions;

(2) that a prior administrative decision on which the administrative law judge relied is incorrect or should be changed; or

(3) that a technical error in a finding of fact should be changed.[54]

Since TCEQ's changes went beyond correcting technical or legal errors, petitioners first argue that TCEQ exceeded its statutory authority.

But Section 2003.047(m) of the Government Code expressly grants TCEQ the authority to change any finding of fact:

Except as provided in Section 361.0832, Health and Safety Code, the commission shall consider the proposal for decision prepared by the administrative law judge, the

---

[54] TEX. GOV'T CODE § 2001.058(e).

20

exceptions of the parties, and the briefs and argument of the parties. The commission *may amend the proposal for decision, including any finding of fact*, but any such amendment thereto and order shall be based solely on the record made before the administrative law judge. Any such amendment by the commission shall be accompanied by an explanation of the basis of the amendment.[55]

These two provisions—Sections 2001.058(e) and 2003.047(m)—cannot both apply. Section 2001.058(e) sharply curtails a reviewing agency's authority to revisit basic "adjudicative" facts.[56] For findings that do not implicate agency policy or legal interpretation, an agency is only authorized to correct technical errors. In contrast, Section 2003.047(m) plainly authorizes TCEQ to amend "*any* finding of fact" so long as the amendment is based on the administrative record and accompanied by an explanation. This is a much looser standard that allows TCEQ to revisit the record, reweigh the evidence, and revise "any" findings.

Petitioners point to Section 2003.047(n)—a gap-filling provision that incorporates the provisions of Chapter 2001 to the extent they are not inconsistent with Section 2003.047.[57] Petitioners argue that it is possible for TCEQ to comply with both provisions. Therefore, the provisions are not "inconsistent" and both must apply. While we favor

---

[55] *Id.* § 2003.047(m) (emphasis added).

[56] *See Hyundai Motor Am. v. New World Car Nissan, Inc.*, 581 S.W.3d 831, 838 (Tex. App.—Austin 2019, no pet.) ("Adjudicative facts . . . are 'roughly the kind of facts that go to a jury in a jury case.'" (quoting *Flores v. Emps. Ret. Sys.*, 74 S.W.3d 532, 539 (Tex. App.—Austin 2002, pet. denied))).

[57] *See* TEX. GOV'T CODE § 2003.047(n) ("The provisions of Chapter 2001 shall apply to contested case hearings for the commission to the extent not inconsistent with this section.").

concurrent operation of overlapping statutes,[58] the provisions at issue provide two fundamentally different grants of authority that do not overlap. Section 2003.047(m) is a self-contained grant of authority specifically crafted for TCEQ. Section 2001.058(e) is a much narrower grant. TCEQ cannot be subject to both—it possesses the broad authority that Section 2003.047(m) specifically grants to it, not the narrow authority of Section 2001.058(e).

Allowing TCEQ more leeway in changing findings of fact is far from an absurd result.[59] Since SOAH is entirely a creature of statute,[60] the Legislature determines the extent of deference an agency owes to SOAH's findings and conclusions. Section 2001.058(e) reflects the Legislature's general preference to place adjudicative factfinding authority primarily with SOAH. But for some agencies that handle complex, technical matters based on objective evidence, such as TCEQ,[61] the Legislature has deemed it fit to grant a more extensive factfinding

---

[58] *See In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 716 (Tex. 2015) ("To the extent possible, we will construe [overlapping provisions of two different statutes] in a way that harmonizes rather than conflicts.").

[59] *See Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011) ("The plain meaning of the text is the best expression of legislative intent unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results.").

[60] *See* TEX. GOV'T CODE § 2003.021 (establishing SOAH and describing its powers and duties).

[61] *Id.* § 2003.047(d) (acknowledging the "technical or other specialized" matters that come before TCEQ).

authority.[62] Such matters depend little—if at all—on matters of witness credibility but are instead well suited for a review of the record and the application of agency expertise.

Certainly, in some instances TCEQ may amend a technical error or correct a misapplication of agency policy. But it does so solely by virtue of its broad authority under Section 2003.047(m) to "amend the proposal for decision, including any finding of fact".[63] Subjecting TCEQ to the restrictions of Section 2001.058(e) would undercut the Legislature's intent to vest TCEQ with more factfinding authority than its sister agencies, as clearly expressed in the text of Section 2003.047(m).[64]

In sum, Section 2003.047(m) provides TCEQ with a specific grant of broad authority to amend a proposal for decision, including any finding of fact, so long as TCEQ bases the amendment solely on the

---

[62] *See id.* § 2003.049(g) (granting the Public Utility Commission expanded authority to change findings of fact); *Sw. Pub. Serv. Co. v. Pub. Util. Comm'n*, 962 S.W.2d 207, 214 (Tex. App.—Austin 1998, pet. denied) (interpreting the clear language of section 2003.049(g) to reflect a legislative intent to give the Public Utility Commission more authority to revisit the complex, objective facts that it handles). Petitioners point out that the Public Utility Commission's grant of authority, and others like it, explicitly state that the authority to change findings of fact is "[n]otwithstanding Section 2001.058" or other contrary law. *See* TEX. GOV'T CODE § 2003.049(g); TEX. TRANSP. CODE § 201.112(c). Section 2003.047 does not include such language. But that does not negate the inconsistency between Sections 2003.047(m) and 2001.058(e). And as Section 2003.047(n) makes clear, only the provisions of Chapter 2001 that are consistent with Section 2003.047 apply to contested case hearings for TCEQ.

[63] TEX. GOV'T CODE § 2003.047(m).

[64] *See Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009) ("Where text is clear, text is determinative of [legislative] intent.").

record and explains itself. This specific grant conflicts with the general grant of narrow authority found in Section 2001.058(e), which only allows agencies to amend certain findings and only for certain reasons. We therefore hold that Section 2003.047(m) governs in this case. Under Section 2003.047(m), TCEQ has the authority to alter "any" finding of fact so long as it is based on the record. That is what TCEQ did here.

2

Petitioners also argue that, even under Section 2003.047(m), TCEQ does not have the authority to make *additional* findings of fact.

An agency only has those powers conferred upon it by the Legislature.[65] Accordingly, an agency may only amend a proposal for decision by adding a finding of fact when the Legislature grants the agency that authority. Applying this principle in *Montgomery Independent School District v. Davis*, we held that a statute authorizing a school board to "reject or change a finding of fact made by [a] hearing examiner . . . only if the finding of fact is not supported by substantial evidence" does not include the authority to find additional facts.[66] Similarly, the Third Court of Appeals has held that Section 2001.058(e) does not authorize an agency to make additional findings of fact.[67]

Here, the authorizing statute is different. Instead of only allowing TCEQ to change a finding of fact, Section 2003.047(m) allows TCEQ to

---

[65] *See Pub. Util. Comm'n v. City Pub. Serv. Bd.*, 53 S.W.3d 310, 316 (Tex. 2001).

[66] 34 S.W.3d 559, 563 (Tex. 2000).

[67] *Hyundai Motor Am. v. New World Car Nissan, Inc.*, 581 S.W.3d 831, 841-842 (Tex. App.—Austin 2019, no pet.).

"*amend the proposal for decision*, including any finding of fact".[68] A proposal for decision is the entire explanation for SOAH's recommendation, containing "a statement of the reasons for the proposed decision and of each finding of fact and conclusion of law necessary to the proposed decision."[69] This grant of authority to "amend" the PFD as a whole encompasses the ability to add to the PFD's constituent parts and authorizes TCEQ to make additional findings of fact based on the record.[70]

**3**

Petitioners next challenge TCEQ's explanation of its changes to the PFD. Section 2001.058(e) requires an agency to "state in writing the specific reason and legal basis for a change made under this subsection."[71] Petitioners argue that Section 2001.058(e)'s explanation requirement applies. But again, TCEQ exercises its authority to amend a PFD by virtue of Section 2003.047(m). On its face, the explanation requirement of Section 2001.058(e)—which only applies to changes

---

[68] TEX. GOV'T CODE § 2003.047(m) (emphasis added).

[69] *Id.* § 2001.062(c).

[70] *See, e.g.*, *Amend*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("to formally alter . . . by striking out, *inserting*, or substituting words." (emphasis added)). Indeed, the legislation enacting Section 2003.047(m) makes it obvious that the Legislature understands the authority to "amend" as including the ability to add a part within the whole: "Chapter 2003, Government Code, is *amended by adding* Section[] 2003.047". Act of Sept. 1, 1995, 74th Leg., R.S., ch. 106, § 1, 1995 Tex. Gen. Laws 898, 898 (emphasis added).

[71] TEX. GOV'T CODE § 2001.058(e).

25

"*made under* [*Section 2001.058(e)*]"[72]—does not apply when the change is made under Section 2003.047(m).

TCEQ still must comply with Section 2003.047(m). The touchstone for agency action is reasoned decision-making. When viewed as a whole, the agency's order should "inform the parties and the courts of the basis for the agency's decision so that the parties may intelligently prepare an appeal and so that the courts may properly exercise their function of review."[73] Accordingly, Section 2003.047(m) requires that any amendment that TCEQ makes to a PFD "be accompanied by an explanation of the basis of the amendment."[74] Petitioners argue that TCEQ's explanation in its final order was inadequate.

In explaining its amendments, TCEQ clearly identified the changes it made, cited to TexCom's extensive and detailed exceptions to the PFD, and explicitly distilled its rationale for granting the permits. TCEQ emphasized SOAH's determination that "there would be no [natural] pathway for the waste to migrate" to a source of fresh water. For contamination to occur, TCEQ explained that "Denbury would have to receive authorization for their carbon dioxide enhancement recovery operations". TCEQ determined these operations were "speculative". Turning to the public-interest requirement, TCEQ explained its conclusion that the Conroe water treatment plant was not a reasonably available alternative—a key finding that the TCEQ reversed. TCEQ noted that "90% of Montgomery County's existing commercial

---

[72] *Id.* (emphasis added).

[73] *Goeke v. Hous. Lighting & Power Co.*, 797 S.W.2d 12, 15 (Tex. 1990).

[74] TEX. GOV'T CODE § 2003.047(m).

nonhazardous waste is going outside of the county for disposal", despite the existence of the Conroe treatment plant.

This explanation section adequately provided TCEQ's bases of disagreement with SOAH's analysis. It allowed petitioners to intelligently prepare their appeal, and has allowed two, now three, reviewing courts to examine TCEQ's evidentiary basis for granting TexCom's permits. When viewed as a whole, TCEQ's explanation satisfied Section 2003.047(m)'s explanation requirement.

**B**

Petitioners next argue that various elements of TCEQ's order are not supported by substantial evidence. We must reverse or remand an agency decision "if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole".[75] In conducting this review, we "may not substitute [our] judgment for the judgment of the state agency on the weight of the evidence".[76] We must uphold the agency's ultimate decision if the evidence "is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action."[77] The agency's decision is "presumed to be supported by

---

[75] *Id.* § 2001.174(2)(E).

[76] *Id.* § 2001.174.

[77] *Tex. Health Facilities Comm'n v. Charter Med.-Dall., Inc.*, 665 S.W.2d 446, 453 (citing *Suburban Util. Corp. v. Pub. Util. Comm'n*, 652 S.W.2d 358, 364 (Tex. 1983)); *see also Maverick County*, 642 S.W.3d at 544 ("The true test

substantial evidence, and the burden is on the contestant to prove otherwise."[78]

Under Section 2001.174(2) of the APA, two conditions must be met before a reviewing court reverses or remands an agency decision. Not only must the agency's challenged "findings, inferences, conclusions, or decisions" be faulty as a matter of law;[79] they must also prejudice the substantial rights of the appellant.[80] If an agency's decision is based on sufficient underlying findings that are supported by substantial evidence, then unnecessary findings cannot render that decision reversible, even if those findings are improper.[81] This is because, even without the improper findings, the agency's decision still stands on substantial evidence. An improper, but superfluous, finding does not prejudice the substantial rights of the appellant.

In this case, TCEQ made the statutorily required determination that TexCom's injection-well operation would be protective of ground and surface water, as required by statute.[82] TCEQ supported this determination on three basic grounds: (1) the Cockfield Formation as a

is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency." (quoting *Charter Med.-Dall., Inc.*, 665 S.W.2d at 452)).

[78] *Maverick County*, 642 S.W.3d at 547 (quoting *Charter Med.-Dall., Inc.*, 665 S.W.2d at 453).

[79] TEX. GOV'T CODE § 2001.174(2).

[80] *Id.*

[81] *See Charter Med.-Dall., Inc.*, 665 S.W.2d at 453 (holding that substantial evidence supported an agency's order despite the fact "that many of the [agency's] 213 findings . . . [were] improper and irrelevant").

[82] TEX. WATER CODE § 27.051(a)(3).

whole is sealed off from water resources, making it a geologically suitable injection zone; (2) under current circumstances, waste injected into the Lower Cockfield would not migrate out of the Lower Cockfield; and (3) *even if* migration did occur, Denbury's operations would not pump the wastewater to the surface.

Petitioners do not contest the Cockfield's geological suitability. Instead, petitioners challenge the migration finding, contending that TCEQ ignored evidence that Denbury's *current* operations would cause migration, not just its future operations.

Petitioners are correct that evidence in the record supports their argument that Denbury's current operations create pressure sinks that will pull waste from the Lower Cockfield to the Upper. But this evidence was disputed. The record contains testimony from multiple experts who concluded that the shale layer between the Lower Cockfield and the Middle Cockfield was persistent and would not allow fluid flow. Indeed, the PFD itself contained contradictory findings on this point, with SOAH finding at one point that "[t]he injected wastewater . . . would remain contained in the Lower Cockfield" and "would not impair any existing mineral rights given the geological structure of the site." And the expert who testified that the waste would migrate out of the Lower Cockfield towards the pressure sinks in the Upper Cockfield did not support this theory of migration with any modeling, maps, or calculations. Finally, modeling indicated that a decade of oil production in the Upper Cockfield had not impacted the pressure in the Lower Cockfield, signaling that the layers are not in communication.

In its order, TCEQ took this conflicting evidence, weighed it, and determined that the waste would not migrate under current conditions. TCEQ supported its migration finding as follows: According to TCEQ, the Lower Cockfield is separated from the rest of the formation by a 30- to 40-foot shale layer that would prevent injected wastewater from migrating to the Middle or Upper Cockfield. TexCom adequately accounted for artificial penetrations through this shale layer. The only place with possible communication between the Cockfield layers was at a possibly transmissive fault, located 4,400 feet from the wellbore. Modeling based on current geological conditions showed that the waste would travel a maximum of just 2,770 feet from the wellbore in the lifetime of TexCom's operation, leaving it far short of the fault.

We hold that this evidence, which is supported in the record, is substantial. While conflicting evidence exists, it is not for a court to "substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion".[83] This migration finding, combined with the injection zone's geological suitability,[84] is sufficient to support TCEQ's ultimate finding that the wells would be protective of water. We need not address TCEQ's findings

---

[83] TEX. GOV'T CODE § 2001.174; *see Maverick County*, 642 S.W.3d at 544.

[84] We note that a finding of geological suitability is a separate regulatory requirement that calls for "a determination that the geology of the area can be described confidently and that limits of waste fate and transport can be accurately predicted". 30 TEX. ADMIN. CODE § 331.121(c)(2). Petitioners concede that "in [this] case, problems exist not due to the lack of geological suitability".

about the consequences of migration, if it were to occur, as any error in these findings does not prejudice the petitioners' substantial rights.

*      *      *      *      *

Accordingly, the judgment of the court of appeals is affirmed.

Nathan L. Hecht<br/>
Chief Justice

**OPINION DELIVERED:** June 10, 2022